Donald HARRISON, Plaintiff-Appellant,

v.

EXXON CORPORATION,
Defendant-Appellee.

No. 86–4565.

United States Court of Appeals,
Fifth Circuit.

Aug. 19, 1987.

Rehearing Denied Sept. 21, 1987.

Earl B. Taylor, Frank P. Trosclair, Jr., Opelousas, La., for plaintiff-appellant.

John M. Roper, Exxon Co., U.S. Atty., Mary Anna Robinson, New Orleans, La., for defendant-appellee.

Before RANDALL, GARWOOD and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Donald Harrison appeals the district court's dismissal of his strict liability claim against Exxon Corporation. La.Civ.Code art. 2322. We affirm.

I.

Donald Harrison was injured while employed by Dolphin-Titan International, Inc. (Dolphin-Titan) to work on a drilling rig owned by Dolphin-Titan. The Dolphin-Titan drilling rig was attached to a fixed platform owned by Exxon and located in the Gulf of Mexico off the coast of Louisiana. Harrison was injured while inspecting a hydraulic line leading to the drilling rig's blowout preventer. During the inspection, a connection broke between the blowout preventer and the hydraulic line, and Harrison was struck in the thigh by pressurized fluid.

The blowout preventer was not directly connected to the drilling rig or to the platform; it was bolted in place atop a "riser," a length of steel pipe which in turn was bolted to the wellhead. The wellhead was not attached to the platform; it was screwed into the top joint of a line of casing embedded in the ocean floor.

The blowout preventer stack was indirectly connected to the drilling rig by means of a pipe, or flowline, through which drilling fluids were pumped into the well. The only other connection between the blowout preventer stack and the drilling rig were various flexible steel hoses that ran from the accumulator pressure tank on the rig to various sections of the blowout preventer stack. These lines transported hydraulic fluid to activate the blowout preventer. The accumulator pressure tank, as well as the steel hoses which connected it to the blowout preventer, were also furnished by Dolphin-Titan.

The flowline and flexible hoses connecting the blowout preventer to the rig were designed to be assembled and disassembled by the removal of nuts and bolts or the unscrewing of threaded couplings. The hydraulic lines, for example, were attached to the rig accumulator pressure tank with turn buckles and tie-down clamps that were designed for easy disconnection without the use of a wrench. Similarly, the flow line on top of the blowout preventer stack could be disconnected by removing four bolts and sliding the sleeve connection backwards. A wrench was necessary to

disconnect the blowout preventer from the wellhead.

The blowout preventer was not ordinarily connected to the wellhead until the well was drilled to a depth of approximately 1500–3000 feet. When the well was completed, the blowout preventer was disassembled. Depending on particular well conditions, all or part of the same blowout preventer, after testing, was connected to successive wells the rig drilled from that platform. Thus the same blowout preventer was not in place on the wellhead during the entire time the Dolphin-Titan rig was attached to the Exxon platform.

Harrison's injury occurred during the testing of a device called a hydril, which is located on the blowout preventer stack. During testing a pipe nipple failed and released pressurized hydraulic fluid that struck and injured Harrison. The pipe nipple forms the connection between the blowout preventer stack and the steel hoses that carry hydraulic fluid from the accumulator pressure tank.

Dolphin-Titan provided the entire blowout preventer stack, including the hydril, pipe nipple, and steel hoses, as part of the equipment needed to drill from the Exxon platform.

Harrison filed the instant lawsuit against Exxon seeking to recover for damages he sustained because of the defective blowout preventer. Harrison's lawsuit is based on Louisiana law which holds owners of buildings or structures, including stationary oil platforms, strictly liable for damages caused by ruin to appurtenances of the structure. La.Civ.Code art. 2322. Dolphin-Titan intervened in the action to recover compensation benefits paid to Harrison under the Louisiana Longshore & Harbor Workers' Compensation Act.

Following a bench trial on the merits, the district court dismissed Harrison's claims as well as the intervention of Dolphin-Titan. The district court held that Exxon was not strictly liable because "the blowout preventer and hydraulic lines were neither necessary appurtenances to Exxon's drilling platform nor movables made immovables by attachment thereto." This appeal followed.

## II.

◼ Louisiana Civil Code article 2322 provides:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.

In order to establish Exxon's strict liability under article 2322, Harrison must establish: (1) that there is a building; (2) that Exxon is the owner of the building; and (3) that there is ruin caused by vice in construction or a neglect to repair the building. *Olsen v. Shell Oil Company*, 365 So.2d 1285, 1289 (La.1979).

For the purposes of La. Civ. Code art. 2322, it is undisputed that Exxon's drilling platform is a "building." *Olsen*, 365 So.2d at 1290. It is also undisputed that building owners are strictly liable for "necessary appurtenances to structures and movables made immovable by attachment." *Id.* at 1291. The issue in this case therefore reduces to whether the Dolphin-Titan blowout preventer was sufficiently attached or appurtenant to the drilling platform to trigger Exxon's strict liability. Because we affirm the district court's finding that Dolphin-Titan's blowout preventer was not sufficiently attached or appurtenant to Exxon's drilling platform, we need not reach the issue of whether the defect in the blowout preventer was a "ruin" due to vice of construction or neglect to repair.

◼ We recognize that "no universally applicable test has evolved from the Louisiana courts which permits ready determination" of what constitutes an appurtenance to a drilling platform. *Steele v. Helmerich & Payne International Drilling Co.*, 738 F.2d 703, 705 (5th Cir.1984). The inquiry is necessarily fact specific and depends on the nature and circumstances of the connection in each case. Under Louisiana law, it is a question of fact whether a particular piece of equipment is sufficiently attached to constitute an article 2322 appurtenance. *Heater v. Texas Gas & Exploration Corp.*,

466 So.2d 504, 505 (La.Ct.App. 3d Cir. 1985). We therefore review the district court's findings under the "clearly erroneous" test. Fed.R.Civ.P. 52(a).

## III.

■ Harrison argues that the evidence established as a matter of law that (1) the blowout preventer is a necessary part of the drilling rig; and (2) the drilling rig is an appurtenance to the platform. Harrison therefore concludes that Exxon is strictly liable for the defective blowout preventer. We disagree.

Harrison's argument simply misses the point. The fact that the blowout preventer is included in the inventory of the drilling rig does not establish that the blowout preventer is an appurtenance of the platform. Exxon is not strictly liable for a defect in every item included in the package of materials that accompanies the drilling rig.

To determine whether Exxon is strictly liable for the damages caused by the defective blowout preventer, we apply the following two-part test:

> In determining whether an attachment is an appurtenance of a building the two general considerations are: how securely the addition is attached to the building and the degree of permanence the parties intend for the addition.

*Steele*, 738 F.2d at 705. *Steele* involved a worker on a drilling rig who fell off a derrick when a "stabbing board" collapsed. *Id.* at 704. The employee had been standing on the "stabbing board," using it as a kind of scaffolding. Although the stabbing board was part of the specialized equipment brought aboard the defendant's drilling rig by the plaintiff's employer, the court found the stabbing board was not sufficiently appurtenant to the drilling rig to trigger strict liability. *Id.* at 705. *Steele's* holding relied on the following factors: (1) the stabbing board was to be attached to the derrick for only two or three days; (2) the stabbing board was "secured loosely" and fell before the attachment of the board to

the derrick was complete; (3) the stabbing board was intended for temporary use; and (4) the stabbing board was more akin to "workmen's tools or implements which go with the workmen from job to job rather than permanent attachments to any particular building or structure." *Id.* at 705–06.

The district court applied the test in *Steele* to the facts in the instant case and found that the blowout preventer was not an appurtenance of Exxon's drilling platform. On the issue of security of attachment, the district court found that "all of the equipment involved was designed to be assembled and disassembled by the removal of nuts and bolts or the unscrewing of threaded couplings." In regard to the issue of permanency of attachment, the district court found that the blowout preventer "was never intended to be permanently attached to Exxon's platform. It was temporarily installed for use during the drilling operation." We hold that the district court's findings are amply supported by the record and are not clearly erroneous.

It is undisputed that the blowout preventer was not attached to the platform. The blowout preventer was primarily attached to the wellhead which in turn had no attachment to the platform itself. The blowout preventer was secondarily connected to the drilling rig by means of a single pipe and various flexible steel hoses. The blowout preventer, at best, was therefore only indirectly connected to the drilling platform.

The record amply supports the district court's finding that the blowout preventer was not securely attached to the drilling rig. There were only two connections between the blowout preventer and the drilling rig: (1) a pipe or flowline that carried drilling fluids into the well; and (2) the various flexible steel hoses that were connected to the accumulator pressure tank through which hydraulic fluid passed. Based on the testimony at trial, neither of these connections were so secure as to trigger Exxon's strict liability as a matter of law.

Frank Nice, an expert in petroleum drilling operations, testified that the blowout

preventer could be easily disconnected from the flexible steel hoses without even using a wrench. According to Nice, the blowout preventer was connected to the steel hoses by means of a hammer union that was designed to allow easy disconnection. Nice explained that a worker would only have to strike the union with a hammer in order to loosen the connection and separate the blowout preventer from the steel hoses.

Steven Cody McDonald, Exxon's expert witness on drilling operations, testified that one could remove the Hydril, the top unit of the blowout preventer, with similar ease. McDonald testified that the Hydril simply had to be unbolted and that no welds had to be cut loose in order for it to be disconnected.

Finally, Edmond Dowell, Exxon's drilling superintendent, testified that the flowline was similarly designed for easy disconnection. The flowline was connected to the pipe nipple on top of the blowout preventer stack by means of a sliding sleeve. Powell explained that one need only remove four bolts and slide the sleeve back to disconnect the flowline from the blowout preventer.

The record also supports the district court's finding that the blowout preventer was not intended for permanent attachment to the drilling rig. The testimony at trial revealed that the blowout preventer was not as permanently attached to the platform as the major components of the drilling rig. During the time the Dolphin-Titan drilling rig was attached to Exxon's platform, the blowout preventer remained disconnected for significant periods of time.

William Columbus Scrivner, a Dolphin-Titan toolpusher, testified that Dolphin-Titan drilled approximately eight to ten wells from the Exxon platform. Scrivner explained that after each well was drilled, the blowout preventer, hydraulic lines and flowline all had to be disconnected so that part or all of the blowout preventer could be reassembled on the next well when it had been drilled to 1500–3000 feet.

Frank Nice confirmed Scrivner's testimony and noted that when the blowout preventer is removed it often must be adapted to accommodate the differing size of the drill pipe in the new well. Nice also confirmed Dowell's testimony that the blowout preventer remains disconnected until the surface casing in the next well is in place.

## IV.

Based on the evidence introduced at trial, it was not clearly erroneous for the district court to have found that the Dolphin-Titan blowout preventer was not appurtenant to Exxon's drilling platform. We therefore affirm the district court's dismissal of Harrison's claim against Exxon as well as the intervention of Dolphin-Titan.

AFFIRMED.