United States Court of Appeals,

Fifth Circuit

No. 97-30081

Summary Calendar.

Geraldine COULTER, wife of/and James Coulter, Plaintiffs-Appellants,

v.

TEXACO, INC., Texaco Exploration and Production, Inc., and Rogers Louviere, Defendants-Appellees.

July 29, 1997.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before HIGGINBOTHAM, WIENER and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

Plaintiffs-Appellants Geraldine and James Coulter appeal from the district court's grant of summary judgment, dismissing their action against Defendants-Appellees Texaco, Inc., Texaco Exploration and Production, Inc., and Texaco employee Rogers Louviere (collectively "Texaco"). Concluding that the district court properly held that Texaco could not be liable under Louisiana Civil Code Articles 2315, 2317 or 2322 for the injuries sustained by Mr. Coulter while he worked for an independent drilling contractor on a drilling rig located on an offshore drilling platform owned by Texaco, we affirm the district court's summary judgment.

I

FACTS AND PROCEEDINGS

In June 1991, Texaco entered into a contract with James

1

Coulter's employer, Dual Drilling Company (Dual), in which Dual agreed to provide a drilling rig ("Dual 25") and a crew to perform drilling operations on a fixed platform owned by Texaco at West Delta, Block 109, in the Gulf of Mexico ("Texaco's platform"). The contract provided that Dual, as an independent contractor, would control, direct and maintain responsibility for the performance of the details of its work, including the rigging up and rigging down of Dual 25 on Texaco's platform and any loading and unloading operations as well. The only right reserved by Texaco was to observe and inspect ("monitor") Dual's work to ensure its satisfactory completion. Defendant Rogers Louviere works for Texaco as a drilling supervisor and, during the time Coulter worked for Dual, was assigned to Dual 25 to monitor Dual's drilling operations. At the time of Coulter's accident, however, Louviere was on vacation and Keith Doucet was serving in his place as Texaco's "company man" monitoring Dual's operations.

In September 1995 Dual 25 was skidded on top of and welded to Texaco's platform. Drilling operations commenced shortly thereafter and were scheduled to be completed in late 1996. Prior to being placed on this platform, Dual 25 had drilled from five other fixed offshore platforms owned by various entities since it was first put into service in 1980.

At the time Dual 25 was positioned on Texaco's platform it was equipped with two cranes. To provide more room for loading and unloading, one of the cranes was removed, and a crane belonging to Texaco, which was already present on this platform, was reassigned

2

to Dual 25 as part of its equipment and repositioned on this rig. Prior to the removal of the second Dual crane from the drilling unit, however, that crane's pedestal had served as two of the six posts for the unit's drill collar pipe rack. Thus, although the pipe rack was supposed to be supported by six posts, only four posts remained after the removal of Dual 25's second crane.

Coulter, a member of Dual's roustabout crew, was injured several months after the repositioning of the crane in question while unloading equipment onto Dual 25 from a supply vessel. Near the end of the crew's 12 hour shift on December 22, 1995, the Dual crew's crane operator moved a Schlumberger Anadrill tool ("MWD tool") from the drill floor to the drill collar pipe rack. Coulter and another roustabout stepped on top of the drill collars to disconnect the crane slings from the MWD tool. After the slings had been removed, Coulter prepared to step off the drill collar pipe rack. At this point, however, one of the boards separating the rows of drill collars broke, allowing a drill collar pipe to roll and injure Coulter's leg. But for the removal of the second crane *and* Dual's failure to replace the missing two posts or otherwise stabilize the pipe rack, the drill collar pipes would have been safely and securely contained and Coulter would not have been injured.

The Coulters sued Texaco in Louisiana state court, seeking damages for the personal injuries Mr. Coulter suffered while employed on Dual 25 when it was positioned on Texaco's platform. They asserted negligence claims under Louisiana Civil Code Article

2315 and strict liability claims under Civil Code Articles 2317 and 2322. Texaco removed the action to federal court, filed a third party complaint against Dual for contractual indemnity, and ultimately moved for summary judgment against the Coulters. The district court granted Texaco's motion for summary judgment, holding that Texaco could not be held liable for James Coulter's injuries under any of the Coulters' theories, and therefore dismissed the Coulters' claims against Texaco with prejudice. The Coulters timely filed their notice of appeal.

## II

## DISCUSSION

A. Standard of Review and Applicability of Louisiana Law

As is well known, we review the grant of a motion for summary judgment *de novo* and apply the same legal standards as does the district court.[1] Texaco's platform is located on the outer Continental Shelf off the Louisiana coast. The Outer Continental Shelf Lands Act (OCSLA) mandates that when disputes arise involving fixed structures erected on the outer Continental Shelf, applicable laws of the adjacent state will be applied to the extent not inconsistent with other federal laws and regulations.[2] Indisputably, then, the personal injury law of Louisiana applies to

---

[1] *See Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773, 776 (5th Cir.1997); *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996); *Duhon v. Mobil Oil Corp.,* 12 F.3d 55, 57 (5th Cir.1994).

[2] *See* 43 U.S.C. § 1333(a)(2)(A); *Rodrigue v. Aetna Cas. and Sur. Co.,* 395 U.S. 352, 355, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969); *Bartholomew v. CNG Producing Co.,* 832 F.2d 326, 328 (5th Cir.1987).

this case, and the Coulters properly asserted their claims under Louisiana's Civil Code.

B. Negligence Claims

The Coulters assert that Texaco is liable in negligence for Mr. Coulter's injuries under Louisiana Civil Code Article 2315. As all of the parties and the district court recognize, however, a principal, such as Texaco, cannot be liable for injuries resulting from the negligent acts of an independent contractor, such as Dual, unless (1) the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or (2) the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts.[3] In this case, Dual's actions clearly did not fall in the limited ultrahazardous category; therefore, the only issue relevant to the Coulters' negligence claims is whether Texaco retained control over or authorized any of Dual's activities that resulted in Coulter's injuries.

Testing for this operational control exception first requires an examination of whether and to what extent the right to control work has been contractually reserved by the principal.[4] Here, as is typically the case in contractual arrangements between platform

---

[3]*Graham v. Amoco Oil Co.,* 21 F.3d 643, 645 (5th Cir.), *rehearing denied,* 28 F.3d 452 (5th Cir.1994); *Bartholomew,* 832 F.2d at 329; *Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548, 549-551 (5th Cir.1987), *cert. denied,* 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988).

[4]*See e.g., Graham,* 21 F.3d at 646; *Ainsworth,* 829 F.2d at 550.

owners and independent drilling contractors, the Texaco-Dual contract broadly provides that Dual "shall control and direct the performance of the details of the work" and further specifies that Dual "shall be *solely responsible* for the various moves of its Drilling Unit, for mooring or unloading operations, if required, and for rigging up and rigging down operations (emphasis added)." Moreover, the fact that a principal like Texaco reserves the right to monitor its contractor's performance and stations a "company man" on the platform who observes the contractor's activities, has the right to make safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or conditions to his (Texaco) superiors, does not mean that the principal controls the methods or details of the contractor's work.[5] In short, absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal like Texaco cannot be liable under the operational control exception.[6]

It is uncontested that (1) Coulter was injured during the unloading of a supply vessel, and (2) the pedestal of Dual's second crane, which had previously served as posts for the drill collar pipe rack, was removed during rigging up operations. As the

---

[5]*See Graham,* 21 F.3d at 646 (presence of company man who observed unsafe working conditions created by unloading of excess amounts of casing and who did not stop operation did not amount to operational control or implicit authorization of those unsafe conditions that led to injury); *Ainsworth,* 829 F.2d at 550.

[6]*Cf. Bartholomew,* 832 F.2d at 329 (company man's express order not to wash down rig floor could amount to express authorization of unsafe practice that caused accident).

contract expressly vests Dual with sole responsibility for both of these operations, Texaco cannot be liable for any injuries resulting therefrom absent some other unusual circumstance.

The Coulters argue that just such an unusual circumstances was present here because Texaco engineers initially gave their consent to reposition the second Dual crane and replace it with the Texaco crane.  The Coulters thus contend that this approval at least amounts to an implicit authorization of the configuration of the drill collar pipe rack with four rather than six posts.  In and of itself, however, the consent of these Texaco engineers to the Dual-Texaco crane swap is insignificant because the Coulters have not pointed to any summary judgment evidence indicating that (1) Texaco knew, at the time the second Dual crane was removed, that the crane's pedestal was serving as two of the six posts for Dual 25's drill collar pipe rack, or (2) Dual was prevented by Texaco from making adjustments to the rack once the crane was moved and it should have become clear to Dual that the rack was unstable. Consequently, there is no evidence that Texaco itself either explicitly or implicitly authorized the initial destabilization, or continued unsafe use, of the drill collar pipe rack.  We therefore conclude that the district court properly dismissed the Coulters' negligence claims against Texaco founded on Article 2315.

C. Strict Liability Claims:  Article 2317 and Garde Liability

The Coulters assert that Texaco is liable for Mr. Coulter's injuries under Louisiana Civil Code Articles 2317 and 2322, which respectively impose a form of "no fault" liability on the custodian

7

of a defective object or the owner of a ruinous building if the object or building poses an unreasonable risk of harm to others and in fact causes injury.[7]

Disregarding as we must the changes wrought by recently adopted Louisiana Civil Code Article 2317.1, we see that Article 2317, as it stood when Coulter was injured, provided:

> We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of ... the things which we have in our custody.[8]

---

[7]The liability imposed upon the custodian of an object under Article 2317 or the owner of a building under Article 2322, prior to the 1996 amendments of the Civil Code's personal injury articles, *see infra* notes 8 & 12, is "strict" (i.e., without fault) in the sense that neither the custodian's or the owner's ignorance of the defective or ruinous condition of the object or building nor the lack of a reasonable opportunity to have detected it will absolve them from liability; however, it is also not absolute because the custodian or owner may escape liability if he proves that the injury was caused by (1) the fault of the victim, (2) the fault of a third person, or (3) an irresistible and unforeseeable force. *See Entrevia v. Hood,* 427 So.2d 1146, 1148 (La.1983). In *Entrevia,* the Louisiana Supreme Court also observed that to recover in "strict liability" under either Article 2317 or 2322, "the injured person must prove that the building or its appurtenances [or the defective thing] posed *an unreasonable risk of injury to others,* and that his damage occurred through this risk." *Id.* (emphasis added). Thus, a trespasser who sustained injuries caused by the collapse of steps leading from an unoccupied, fenced farmhouse posted with "no trespassing" signs is not entitled to recover in strict liability under either Article 2317 or 2322 because imperfections in the steps of such a building did not constitute an unreasonable risk of harm to others. *Id.* at 1150.

[8]La.Civ.Code Ann. art. 2317 (West 1979). In 1996, the Louisiana legislature adopted Article 2317.1 which significantly modified Article 2317's imposition of liability by providing that:

> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

8

Thus, at the time Article 2317 imposed liability when (1) the thing causing damage was in the custody (or "garde") of the defendant; (2) the thing had a vice or defect creating an unreasonable risk of harm; and (3) the vice or defect occasioned damage.[9] The Coulters contend that Texaco had custody or "garde" of the defective drill collar pipe rack because either (1) the entire Dual drilling unit was an appurtenance to or component part of Texaco's platform, or (2) Texaco supervisors were present on Dual 25 at all times and Texaco engineers participated in the installation of Dual 25 and approved the removal of the Dual crane and the redeployment of the Texaco crane in its stead. Neither contention has merit.

With respect to the first argument, as we will explain below in Part II.C.2, Dual 25 cannot be characterized as an appurtenance to or component part of Texaco's platform under applicable Louisiana law. With regard to the second contention, Louisiana courts have generally held that (1) ownership of a thing establishes a rebuttable presumption of custody or "garde," and (2) in a case of non-ownership, a defendant may be found to have custody over property when he exercises direction and control of the thing and derives some benefit from it.[10] Thus, Dual's

---

La.Civ.Code Ann. art. 2317 (West Supp.1997). As the events triggering the Coulters' lawsuit all took place prior to April 16, 1996, the effective date of new Article 2317.1, we apply Article 2317 without considering the negligence elements added by Article 2317.1.

[9]*Ainsworth,* 829 F.2d at 551; *Boutwell v. Chevron U.S.A., Inc.,* 864 F.2d 406, 409 (5th Cir.1989).

[10]*See Thumfart v. Lombard,* 613 So.2d 286, 290 (La.Ct.App. 4th Cir.), *writ denied,* 617 So.2d 1182 (La.1993); *Doughty v. Insured*

ownership of the rig, coupled with the Texaco-Dual contract, which specifically states that Dual "shall continue to have custody of and to be responsible for the Drilling Unit and maintaining of same," establishes a strong presumption that Dual 25 was in the legal custody of Dual, not Texaco. The total absence of evidence that Texaco exercised actual control over the ongoing implementation of any of the various parts of Dual 25—including the allegedly defective drill collar pipe rack—makes this presumption conclusive. Just as with the Coulters' negligence claims under Article 2315, neither the mere presence of Texaco company men who monitored Dual's performance of its contractual obligations nor the limited involvement of Texaco engineers' in approving the exchange of cranes comes anywhere close to creating the kind of supervision and control necessary to establish Texaco's custody over the drilling rig or the drill collar pipe rack for purposes of Article 2317.[11] Consequently, the district court properly dismissed the Coulters' claims asserted under Article 2317.

D. Article 2322 and Premises Liability

The last foundation of the Coulters' claims against Texaco is

---

*Lloyds Ins. Co.,* 576 So.2d 461, 464 (La.1991); *Ross v. La Coste de Monterville,* 502 So.2d 1026, 1032 (La.1987). This court has similarly defined "custody," in the context of Article 2317, to mean supervision and control. *See Ainsworth,* 829 F.2d at 551; *Boutwell,* 864 F.2d at 409.

[11]*See Ainsworth,* 829 F.2d at 551-52 (independent contractor's complete ownership of drilling rig, its component parts, and tools used in rigging up, combined with platform owner's non-participation in rig up precluded "garde" liability for accident caused by failure of drill rig owner to provide lighting for work area during rig up).

Louisiana Civil Code Article 2322, which, at the time of Mr. Coulter's injury, provided:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.[12]

Thus, Article 2322 imposed its particular variety of "no fault" liability when an injured person establishes that (1) there is a building; (2) the building is owned by the defendant; and (3) there is a "ruin," caused by some vice in the building's construction or by a neglect to repair it, which occasions the injury.[13] Here, no one disputes that (1) a fixed offshore drilling platform is a building for purposes of Article 2322,[14] and (2) liability may be imposed under Article 2322 against a building's owner when a defect or ruinous condition is located in "an appurtenance" to, or integral part of, the building, as well in the actual structure or materials of the building itself.[15]

As the Coulters have not alleged any defect or ruinous

---

[12]La.Civ.Code Ann. art. 2322 (West 1979). Just as with Article 2317, in 1996 the Louisiana legislature adopted revised Article 2322, which limited the imposition of damages upon an owner of a building to instances when there is "a showing that he knew, or in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care." La.Civ.Code Ann. art. 2322 (West Supp.1997). As the events underlying this action all preceded April 16, 1996, the effective date of the revised article, we apply the former, unmodified version of Article 2322.

[13]*Olsen v. Shell Oil Co.,* 365 So.2d 1285, 1289 (La.1978).

[14]*Id.* at 1289-90.

[15]*See Entrevia,* 427 So.2d at 1148.

condition in the structure or material of Texaco's platform qua platform, their strict liability claim under Article 2322 rises or falls on their ability to prove that at the time of the injury Dual 25 had become an appurtenance to, or integral part of, Texaco's platform by virtue of that rig's physical attachment to that structure. Applying Louisiana Civil Code Article 466's requirement that a component part of a building be "permanently attached," the district court held that the Coulters could not establish that Dual 25 was an appurtenance to, or integral part of, the Texaco platform and thus dismissed their claim under Article 2322.

Recognizing that the district court's resolution of this final issue has potentially broad applications on the outer Continental Shelf,[16] we now review the jurisprudential and statutory developments pertinent to the issue to demonstrate (1) how Louisiana Civil Code Article 466 has indeed come to provide the appropriate and sole criterion for determining whether an addition has become an integral part of a building for purposes of imposing liability on the building's owner under Article 2322, and (2) how Article 466 is properly applied in this context.

1. *Article 466 as Sole Criterion for Determining Whether an Addition is Part of a Building*

Our review begins with *Olsen v. Shell Oil Co.*[17] a case in which the owner of a drilling platform was sued under Article 2322

---

[16]*See Walker v. Tenneco Oil Co.,* 615 F.2d 1121, 1124 (5th Cir.1980) (pretermitting a definitive holding on this same "appurtenance" issue because of its "widespread ramifications").

[17]365 So.2d 1285.

for injuries and deaths resulting from the explosion of a water heater that was part of a modular drilling rig which had been located on a fixed drilling platform. After we certified several questions to the Louisiana Supreme Court, that court resolved, inter alia, that the modular drilling rig and its accompanying modular living unit did constitute appurtenances of the drilling platform for purposes of assessing liability against the owner of the platform under Article 2322, despite the separate ownership of the drilling rig and the platform.[18] In the years immediately following *Olsen,* we reached contradictory results in two cases that required a determination whether particular pieces of equipment attached to a drilling platform were appurtenances of the platform for purposes of assessing liability under Article 2322. In one case, we held that a fire hose directly attached to a platform was an appurtenance;[19] yet in another, we expressed doubt that a portable and easily detached "snubbing unit" (a hydraulic jacking mechanism designed to allow lengths of pipe to be forced into and pulled out of a pressurized well) could be considered appurtenant to a platform.[20] Over time our "appurtenance" jurisprudence stabilized, however, and in several cases we applied a two part test to determine whether various kinds of equipment or additions could be characterized as appurtenances of a drilling platform. In

---

[18]*Id.* at 1289-1292.

[19]*Champagne v. Chevron U.S.A., Inc.,* 605 F.2d 934, 936 (5th Cir.1979).

[20]*Walker v. Tenneco Oil, Co.,* 615 F.2d at 1124.

13

particular, we considered (1) how securely the equipment or addition was attached to the platform and (2) the degree of permanence the parties intended for the object.[21] In one of these decisions, we also recognized that the definition of permanent attachment used to identify component parts of a corporeal immovable in Louisiana Civil Code Article 466 should also be considered in determining whether an attachment was an appurtenance under Article 2322.[22]

Building on these decisions but also paying close attention to the 1978 revisions of the Louisiana Civil Code articles on immovables, several decisions from the United States District Court for the Eastern District of Louisiana took the "part of a building" inquiry posed by strict liability claims under Article 2322 one step further. In two opinions, the late Judge George Arcenaux, Jr. persuasively reasoned that both *Olsen* and our subsequent "jurisprudentially-developed concept of "appurtenance' " are obsolete because the 1978 revisions of the Civil Code (1) erased Louisiana's antiquated categories of immovables by nature, immovables by destination, and immovables by object,[23] replacing them with the single category of corporeal immovables, and (2)

---

[21]*See Steele v. Helmerich & Payne Intern. Drilling Co.,* 738 F.2d 703, 705 (5th Cir.1984) (stabbing board not an appurtenance of drilling rig); *Knapp v. Chevron USA, Inc.,* 781 F.2d 1123, 1127 (5th Cir.1986) (safety net not an appurtenance of platform); *Harrison v. Exxon Corp.,* 824 F.2d 444, 447 (5th Cir.1987) (blowout preventer was not an appurtenance of platform).

[22]*Steele,* 738 F.2d at 706.

[23]*See* La.Civ.Code art. 463 (1870) (West 1972 Compiled Ed.).

clearly defined what would constitute a component part of a corporeal immovable such as a building in terms of permanent attachment.[24] Consequently, concluded Judge Arcenaux, Article 466's definition of component parts of a building should now provide the sole criterion for determining whether an addition can be considered a part of a building for purposes of assessing liability against the owner under Article 2322.[25] Recently Judge Vance of the Eastern District reiterated this view in another case that involved a negligence action against a drilling platform owner and turned on the plaintiff's ability to demonstrate that a drilling rig was part of the platform on which it was positioned.[26] Not coincidentally, in *Sistrunk, Boggs,* and *Dupre,* the district court found that neither individual parts of a drilling rig nor the entire drilling rig itself could be considered a component part of a platform.[27] Having reviewed this gradually developing jurisprudential gloss on the unavoidable property law question posed by claims asserted under Article 2322, yet agreeing with the carefully reasoned opinions of our colleagues of the Eastern District of Louisiana

---

[24]*Sistrunk v. Conoco, Inc.,* 693 F.Supp. 498, 501 (E.D.La.1988); *Boggs v. Atlantic Richfield Co.,* 720 F.Supp. 72, 73-74 (E.D.La.1989).

[25]*Id.*

[26]*Dupre v. Chevron U.S.A., Inc.,* 913 F.Supp. 473, 477 (E.D.La.1996), *aff'd on other grounds,* 109 F.3d 230 (5th Cir.1997).

[27]*See Sistrunk,* 693 F.Supp. at 501 (monkey board not an appurtenance of platform for purposes of Article 2322 liability); *Boggs,* 720 F.Supp. at 75 (drilling rig itself not a part of platform); *Dupre,* 913 F.Supp. at 477-78 (drilling rig not a part of platform).

which recognized the primacy of the Civil Code articles that are specifically applicable to such a question, we hold that Louisiana Civil Code Article 466 does provide the sole framework within which to determine whether additions or equipment attached to a building can be considered a part of that building for purposes of assessing liability under Article 2322.

2. *Application of Article 446*

Stated in full, Article 466 provides:

> Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical, or other installations, are its component parts.

> Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.[28]

Applying Article 466, the district court in the instant case held that, even though Dual 25 was welded to the Texaco platform and had remained that way for over a year, this rig was not a "component part" of the Texaco platform because (1) the rig has drilled from five different platforms over the past fifteen years and indeed was scheduled to be moved off Texaco's platform later in 1996, and (2) neither the rig itself nor the platform will sustain permanent damage when the rig is eventually removed. In short, the district court concluded that the instant rig, Dual 25, was designed to be moved and was not intended to be a permanent attachment to Texaco's platform. Notwithstanding the Coulters' contention that the district court's application of Article 466 was both factually and legally flawed, our review of the commentaries addressing Article

---

[28]La.Civ.Code Ann. art. 466 (West 1980).

16

466 and the federal and Louisiana case law applying the article satisfies us that the district court reached the correct result.

According to two current Louisiana property law scholars, Article 466's two paragraphs recognize the existence of two separate categories of component parts of buildings or other constructions, the scope of which can each be defined in distinct terms.[29] Relying on the source provisions of the first paragraph (former Article 467 (1870)) and the second paragraph (former Article 469 (1870)), Professor Symeon Symeonides interprets present Article 466 as "defining two categories of component parts: (1) those that fit within the illustrative list of paragraph one because they are attached to a building or other construction in a perpetual, rather than a temporary, manner; and (2) those that fit within paragraph two because they are permanently attached to a building or other construction, and cannot be removed without substantial damage to themselves or to the immovable."[30] Professor A.N. Yiannopoulos is of the same view, stating that "[f]acility of removal is immaterial" with regard to the category defined by the first paragraph and that "permanent attachment does not mean attachment "for perpetuity or eternity' " with regard to the category defined by the second paragraph.[31]

---

[29]*See* A.N. Yiannopoulos, *Property,* § 142, at 313-14, in 2 *Louisiana Civil Law Treatise* (3d ed. 1991); Symeon Symeonides, *Property, Developments in the Law,* 46 La.L.Rev. 655, 687-90 (1986).

[30]*Hyman v. Ross,* 643 So.2d 256, 258 (La.Ct.App. 2nd Cir.1994) (citing Symeonides, 46 La.L.Rev. at 687-90).

[31]Yiannopoulos, § 142, at 313-314 (citations omitted).

17

Application of the "substantial damage" test found in the article's second paragraph is a largely objective and fact bound exercise that has posed few jurisprudential difficulties.[32] Definition of the scope of Article 466's first category of component parts, on the other hand, was considerably advanced by our decision in *Equibank v. United States, Internal Revenue Service,*[33] in which we concluded that several expensive antique chandeliers were component parts of a New Orleans mansion. Although the chandeliers could be, and in fact were, removed without substantial damage to themselves or the mansion, we nevertheless found that they fit within Article 466's other less stringently defined category of component parts because they could be sub-categorized as "electrical installations." Crucially, we distinguished installations like chandeliers from simple "plug-in" items, such as table and floor lamps, toasters, and television sets, noting that "in the eyes of society" the latter are not electrical installations because they are neither fixed in place nor require any special knowledge or expertise to be engaged or disengaged from the building's power source.[34] On the other hand, we concluded that lighting *fixtures,* whether they be plain or ornate, are among those features of a house that "the average, ordinary, prudent person buying a home" expects to find "when he or

---

[32]*Id.* at 314.

[33]749 F.2d 1176 (5th Cir.1985).

[34]*Id.* at 1179.

18

she arrives to take possession."[35]   Intermediate appellate courts in Louisiana have applied our *Equibank* "ordinary societal expectations" test in a number of cases, frequently considering as particularly relevant factors (1) whether the object is connected to interior wiring or a main power source of the primary structure, and (2) whether special expertise or skill is required to install or detach the object without causing damage.[36]

This brings us at last to the Coulters' contention that Dual 25 qualifies as a component part of Texaco's platform under either paragraph of Article 466.  First, argue the Coulters, the rig should be considered permanently attached to the platform under the "substantial damage" test of the second paragraph of Article 466 because both the rig and the platform were modified in connection with the installation of the former on the latter and, upon removal, both will require repair and renovation to return them to their original conditions.  In particular, the Coulters point to the removal of Dual's second crane and the necessity for the removal and relocation of handrails and other features of the platform.

---

[35]*Id.* at 1180.

[36]*See e.g., Hyman,* 643 So.2d at 261 (heating and air conditioning units installed in motel are component parts); *In re Chase Manhattan Leasing Corp.,* 626 So.2d 433, 434 (La.Ct.App. 4th Cir.1993), *writ denied,* 630 So.2d 797 (La.1994) (scoreboard system was a component part of the Louisiana Superdome); *Lakeside National Bank of Lake Charles v. Moreaux,* 576 So.2d 1094, 1096 (La.Ct.App. 3rd Cir.1991) (septic tank systems and air conditioning systems are component parts of house); *American Bank & Trust Co. v. Shel-Boze, Inc.,* 527 So.2d 1052, 1054-55 (La.Ct.App. 1st Cir.1988), *writ denied,* 532 So.2d 155 (La.1988) (light fixtures and carpeting are component parts of two residences).

Although the scope of these repairs and renovations to the platform and Dual 25 may well be "substantial" on an absolute basis, they are certainly negligible relative to these two multi-million dollar structures. Moreover, the Coulters have presented no evidence that the anticipated removal of Dual 25 will cause it or Texaco's platform to sustain any enduring "damage" in the sense that either will thereafter become functionally impaired on a permanent basis. Indeed, the repairs and renovations that both the rig and the platform will require upon the former's removal cannot be considered, in the particular circumstances of this case, anything but a form of ordinary and entirely expected maintenance. Accordingly, we conclude that Dual 25 cannot qualify as a component part of Texaco's platform under the second paragraph of Article 466.

The Coulters also contend that Dual 25 should be considered a component part of the platform under the first paragraph of Article 466 and our "ordinary societal expectations" test of *Equibank.* To this end, the Coulters place special reliance on (1) Dual 25's connection to the platform's primary electrical power source and multiple other services, and (2) the special expertise that is required for both installation and removal of the rig. Notwithstanding these facts, we are convinced that in light of the relevant "societal expectations"—those of the offshore oil and gas drilling and production industry—Dual 25 cannot be considered permanently attached to Texaco's platform.

Taking into consideration the Dual-Texaco contract itself, the

20

Dual rig's history of use on multiple platforms during its life time, and the custom and practices of the offshore oil and gas drilling and production industry as a whole, we conclude that, to paraphrase the language of *Equibank,* the average, ordinary, and prudent business entity that was buying or, alternatively, taking a security interest in, an offshore drilling platform would not expect, in the absence of specific contractual provisions to the contrary, an extremely costly drilling rig, one of the heaviest and most sophisticated pieces of industrial equipment in use currently, to be (1) perpetually attached to the platform as a component part when the buyer took possession or (2) a permanent part of that platform when the lender obtained its security interest.  To conclude otherwise would fly in the face of economic reality and long held contractual expectations of an entire industry.  It follows, therefore, that Dual 25 cannot be considered a component part of the Texaco platform under the first paragraph of Article 466 either.  Having concluded, as did the district court, that the Dual rig on which Mr. Coulter sustained his injuries was not a part of the platform owned by Texaco, we affirm the district court's grant of summary judgment on the Coulters' strict liability claim asserted under Louisiana Civil Code Article 2322.[37]

For the reasons set forth above, the district court's judgment dismissing the Coulters' suit against Texaco is, in all respects,

---

[37]Having found that the Coulters failed to establish liability on this ground, we, like the district court, need not address Texaco's alternative argument that the Dual rig in general, and the drill collar pipe rack in particular, were not in a ruinous condition on account of the missing posts.

AFFIRMED.