805 So.2d 432 (2001)
EXXON CORPORATION
v.
FOSTER WHEELER CORPORATION, Texas Pipe Bending Inc., Tube Turns Technology Inc., ABC Insurance Companies, and XYZ Insurance Companies.
No. 2000 CA 2093.
Court of Appeal of Louisiana, First Circuit.
December 28, 2001.
*433 Charles S. McCowan, Jr., L. Victor Gregoire, Donna V. Yelverton, William V. Courtney, Belinda B. Clary, John R. Tharp, Baton Rouge, for PlaintiffAppellant Exxon Mobil Corporation.
Thos. W. Davenport, Jr., M. Shane Craighead, Monroe, for DefendantAppellee Foster Wheeler Corporation.
Before: FOGG, FITZSIMMONS, and KLINE,[1] JJ.
FOGG, J.
By this appeal, Exxon Mobile Corporation (Exxon) contests a judgment sustaining an exception of peremption pursuant to LSA-R.S. 9:2772 and dismissing Foster Wheeler Corporation from its suit for damages. For the following reasons, we affirm.
In 1962, Foster Wheeler Corporation entered into a contract with Humble Oil, a predecessor of Exxon, to build a multiproduct manufacturing facility in Baton Rouge, Louisiana (the East Coker facility), provide engineering services associated with the construction of the facility, and supply the equipment used in the manufacturing process. Foster Wheeler constructed the East Coker facility in 1962 and 1963. In 1963, Humble Oil took possession of the facility and began operations.
The East Coker facility was a delayed coking unit that produced a thermal degradation of heavy residues or petroleum pitches. The entire process occurred in a closed, pressurized system, with temperatures of materials flowing through the system ranging from approximately 500 degrees to 925 degrees Fahrenheit.
The facility consisted of an integrated collection of equipment connected by process piping and functioning as a processing unit. Some parts of the processing unit were located within a concrete coker structure while others were located outside the concrete structure. The process piping was comprised of fittings, flanges, couplings and pipe ("spool items") that were divided into sections called "pipe spools." The pipe spools were joined together by *434 welds or flange bolts and rested on "sliders." The pipe spools and sliders rested on pipe racks.
On August 2, 1993, a fire destroyed the East Coker facility. On July 27, 1994, Exxon filed suit, naming as defendant, among others, Foster Wheeler. Therein, Exxon asserted that the fire was caused by the failure of a pipe fitting or elbow portion of a pipe spool, installed by Foster Wheeler and located outside the concrete coker structure. Exxon asserted causes of action in products liability, negligence, breach of warranty and/or redhibition, and breach of contract against Foster Wheeler. Exxon sought to recover in excess of $50,000,000 of direct damages as a result of the fire, including the cost of cleaning up after the fire and rebuilding the East Coker facility, plus its lost profits resulting from the shutdown of part of the refinery pending cleanup and reconstruction, and loss of business opportunity as a result of diminished production capacity pending rebuilding the East Coker facility.
In response to the lawsuit, Foster Wheeler filed an exception of peremption pursuant to LSA-R.S. 9:2772. On August 3, 2000, the trial judge sustained the exception and dismissed Exxon's claims against Foster Wheeler.[2] Exxon appeals.
LSA-R.S. 9:2772 provides for a peremptive period for actions involving deficiencies in surveying, design, supervision, or construction of immovables or improvements thereon. The statute was amended by 1999 Louisiana Acts, No. 1024, effective August 15, 1999; however, in this case, the pre-revision law applies as the amendment applies only to contracts entered into on or after the effective date. Section 2772 of the pre-revision statute provides, in pertinent part:
A. No action, whether ex contractu, ex delicto, or otherwise, including, but not limited to an action for failure to warn, to recover on a contract or to recover damages shall be brought... against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property:
(1) More than ten years after the date of registry in the mortgage office of acceptance of the work by owner; or
(2) If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than ten years after the improvement has been thus occupied by the owner;
The above legislation applies only to immovables. When a defendant seeks to become the beneficiary of the peremption preclusion provided by LSA-R.S. 9:2772, the threshold determination is the applicability of the LSA-C.C. arts. 462, 463, 465, or 466, which define the term "immovable." Poree v. Elite Elevator Services, Inc., 94-2575 (La.App. 4 Cir. 11/16/95), 665 So.2d 133, writ denied, 95-3008 (La.2/16/96), 667 So.2d 1053; McNamara v. Electrode Corp., 418 So.2d 652 (La.App. 1 Cir.), writ denied, 420 So.2d 986 (La.1982).
Louisiana Civil Code article 462 provides that tracts of land, with their component parts, are immovables. Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruits of trees, are *435 component parts of a tract of land when they belong to the owner of the ground. LSA-C.C. art. 463. Buildings and standing timber are separate immovables when they belong to a person other than the owner of the ground. LSA-C.C. art. 464. Things incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts. LSA-C.C. art. 465. LSA-C.C. art. 466 provides, as follows:
Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.
It is undisputed by the parties that the coker structure was an immovable. We agree with this conclusion as the concrete coker structure was fastened to the ground with concrete and permanently embedded in land that was owned by Exxon. LSA-C.C. art. 463. See also In re Chase Manhattan Leasing Corp., 626 So.2d 433 (La. App. 4 Cir.1993), writ denied, 93-2943 (La.1/28/94), 630 So.2d 797; Harris v. Black Clawson Co., 961 F.2d 547 (5th Cir. 1992). In dispute is whether the allegedly failed elbow was an immovable under LSA-C.C. art. 466.
Civil Code article 466 was analyzed in the case of Equibank v. United States, Internal Revenue Service, 749 F.2d 1176 (5th Cir.1985). In Equibank, the plaintiff held a second mortgage on a New Orleans mansion. Foreclosure proceedings were filed on the first and second mortgages. The issue in Equibank was whether several expensive antique chandeliers were component parts of the taxpayer's mansion in which they were installed and, thus, immovables and subject to the lender's mortgage, or movables subject to a federal tax lien. In analyzing the facts under the first paragraph of article 466, the court considered whether reasonable persons would expect the items to compose parts of a residence and, therefore, be immovable. It concluded that the chandeliers were component parts under paragraph one of article 466 because ordinary "societal expectations" were that the chandeliers were "permanently" attached and would remain indefinitely. In this regard, the court stated:
The ordinary view of society being a relevant consideration, we conclude our consideration by asking the near-rhetorical question: Does the average, ordinary, prudent person buying a home expect the light fixtures to be there when he or she arrives to take possession? Does that person expect the room to become illuminated when the light switch is thrown or should that person reasonably expect no response to the switch and, upon looking up, reasonably expect to see only a hole in the ceiling with the interior house wiring sticking out of the electrical workbox? In our view, the societal expectation is to have the lights go on.
Equibank, 749 F.2d at 1180.
The relevance of considering the community's view in determining the scope of the categories enumerated in the first paragraph of LSA-C.C. art. 466 and the disjunctive nature of article 466 were first recognized judicially in Lafleur v. Foret, 213 So.2d 141 (La.App. 3 Cir.1968). Showboat Star Partnership v. Slaughter, XXXX-XXXX (La.4/3/01), 789 So.2d 554. Therein, the court stated that "the proper standard to apply in the case here ... is a determination of whether the non-enumerated item, is, according to contemporary objective *436 standards, a component of the immovable." Lafleur, 213 So.2d at 148. Under that test, the court looked to "(i) contemporary views as to conceptions of components in light of current house construction practices, and (ii) the degree of connection or attachment to the building" and stated that different factual contexts may also warrant additional considerations. Lafleur, 213 So.2d at 148.
The reasoning in Lafleur and Equibank, regarding the relevance of societal expectations and the disjunctive nature of the two paragraphs of article 466, has been adopted in Louisiana state courts. See, e.g., Hyman v. Ross, 26,096 (La.App. 2 Cir. 9/21/94), 643 So.2d 256; In re Chase Manhattan Leasing Corp., 626 So.2d 433 (La.App. 4 Cir.1993), writ denied, 93-2943 (La.1/28/94), 630 So.2d 797; American Bank & Trust Co. v. Shel-Boze, Inc., 527 So.2d 1052 (La.App. 1 Cir.1988), writ denied, 532 So.2d 155 (La.1988). Also, in Coulter v. Texaco, Inc., 117 F.3d 909 (5th Cir.1997), the Fifth Circuit applied the Equibank test in determining whether a drilling rig was a component part of a drilling platform and, therefore, immovable property.
However, recently in the case of Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co., 179 F.3d 169 (5th Cir.1999), the federal court questioned the reasoning of the Equibank decision. In Prytania Park, the Fifth Circuit considered whether custommade furniture attached to the walls of a hotel were component parts of the building or simply movable property. In applying article 466, the court questioned the appropriateness of using the societal expectations test in determining whether something is immovable under that article. However, it did not overrule Equibank and finally concluded that the furniture involved did not satisfy either the societal expectations test or the substantial damage standard of article 466.
Subsequently, in Showboat Star Partnership v. Slaughter, 789 So.2d at 558, the Louisiana Supreme Court stated that "[t]he judicial interpretations of Article 466 have not been consistent, but the courts generally have applied a societal expectations analysis." Recognizing the discrepancy in federal jurisprudence created by Prytania Park, the court in Showboat nevertheless validated the reasoning of Lafleur and Equibank regarding the relevance of societal expectations and the disjunctive nature of the two paragraphs of article 466.
Clearly, the elbow portion of the pipe spool does not fit into any of the enumerated categories listed in paragraph one of article 466. We find, however, that the elbow was a component part of an immovable under paragraph one as it satisfies the requirements of the societal expectations test and constitutes an "other installation" that is permanently attached to an immovable.
Although the pipe spool and elbow were not traditional plumbing fixtures, they were essential in the transport of material in the same way plumbing fixtures transport material. Experts for Exxon and Foster Wheeler agreed that the elbow was considered an integral component of the coker plant and was essential to the operation of the facility as all matter being processed had to pass through the elbow. Undoubtedly, a purchaser of a coker facility would expect it to be functional, with all required pipes, when possession was taken.
Furthermore, although it is undisputed that repair and replacement of pipe spools, including elbows, is an expectation and practice of the petroleum industry, it was also undisputed that that process required specialized skills and expertise, and the *437 halting of production. At the time of the fire in 1993, the elbow at issue had been in place for thirty years without repair or replacement. Clearly, it was permanently attached and had remained in place indefinitely.
Considering the function and nature of the elbow, we conclude that the societal expectation is that it was a component part of the coker facility. It was an "other installation" that was permanently attached to an immovable and a component part of that immovable. Having concluded that the elbow was an immovable under the first paragraph of article 466, we pretermit discussion of paragraph two and find the peremptive period of LSA-R.S. 9:2772 is applicable under the facts of this case.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs are assessed against Exxon Mobile Corporation.
AFFIRMED.
FITZSIMMONS, J., concurs, and assigns reasons.
FITZSIMMONS, Judge, concurring with reasons.
I respectfully concur in the determination that the elbow and piping process constitute "component parts" of the East Coker facility based on the specific facts and circumstances in this case. It is undisputed that pursuant to La. C.C. art. 466, if the "thing" under review is capable of being categorized as one of the four specified examples, then there is no necessity to consider the second paragraph of the article to determine whether the thing comprises a component part. Article 466 additionally allows for other types of component parts through the catch-all phrase "other installations;" however, beyond the expressly delineated examples in La.C.C. art. 466, the term "component parts" is not readily decipherable. In such circumstances, the second paragraph of article 466 comes into play. This paragraph defines "permanently attached" as things that "cannot be removed without `substantial damage' to themselves or to the immovable to which they are attached."
Jurisprudential analysis of the rather amorphous standard established in article 466 has meandered along a winding course from which the concept of "social expectations" has ultimately survived. As is pointed out in the recent Louisiana Supreme Court case, Showboat Star Partnership v. Slaughter, XXXX-XXXX (La.4/3/2001), 789 So.2d 554, the federal and state courts have differed in their analysis of the relationship of the two single-sentence paragraphs comprising article 466. In Showboat, movable gaming equipment could not be classified as one of the expressly identifiable component parts listed in paragraph one. In a lengthy footnote, the supreme court compared the historically disjunctive approach to article 466 taken by the state courts (beginning with Lafleur v. Foret, 213 So.2d 141 (La.App. 3rd Cir.1968) and Equibank v. United States Internal Revenue Service, 749 F.2d 1176 (5th Cir. 1985)[1]) with the relatively recent conjunctive analysis employed by the federal court, notably in Prytania Park Hotel, Limited v. General Star Indemnity Company, 179 F.3d 169 (5th Cir.1999). In classifying the gaming equipment as movables that were not permanently attached pursuant to article 466, the Showboat court: recognized and embraced the jurisprudentially *438 injected societal expectations vis a vis gaming equipment in a vessel, determined that the gaming equipment was temporarily installed, specifically noted that the equipment was regularly moved, and acknowledged that said removal would not result in damage to the vessel or to the equipment itself. I respectfully suggest that this article, as construed, lacks predictability for lawyers and litigants.
In the instant matter, the elbow under controversy was connected to the East Coker facility, as well as to a pipe spool. It could not be classified as one of the specifically identified examples of component parts in paragraph one of article 466. The vast quantity of testimony in the record indicated that the elbow piping could be attached and detached with relative case, particularly within the context of the standards of the refinery industry. In this regard, the bolted installation could be viewed as comparable to the slot machines in Showboat. However, adhering to the "social expectations" standard of review, expert testimony substantiated that in the refining industry, the elbow and pipe spool are considered standard and expected components of a Coker facility. Moreover, the evidentiary fact that the elbow had not been removed throughout a thirty-year period distinguished the elbow from the periodically relocated slot machines in Showboat and drilling rig in Coulter v. Texaco, Inc., 117 F.3d 909 (5th Cir.1997)[2].
While the classification of the elbow as a component part pursuant to "social expectations" in article 466 can be rationalized, it is opined that this standard fails to consider an equally paramount consideration. An assessment of the premises and the relationship of the movable to the function of the immovable is implicit in the existence vel non of a component part of that premises. In this case, the premises consists of the East Coker facility. The elbow is essential to the function of the premises; moreover, the elbow serves no independent purpose beyond its incorporation into the operation of the Coker facility premises to which it becomes an integral part. Distinguishing it from the gaming machines/vessel in Showboat or the drilling rig/platform in Coulter, which were independently functional, the removal of the elbow results in the inoperability of the Coker facility. Neither the elbow nor the coker unit can function independently. Moreover, when viewed in the context of operability and the raison d'etre of the elbow within the refining industry, one could extrapolate that the dislocation of the elbow unequivocally results in "substantial damage" to the premises of the Coker facility.
In addition to the attribution of La. C.C. art. 466 to confer the status of "component part" on the elbow, another related article of the civil code clearly merits recognition. Louisiana Civil Code article 465 provides: "Things incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts." This article strikes the target. It is not subject to any amorphous test; it is clear. The elbow, whose singular role consists of its functional relationship with the East Coker facility, should certainly be interpreted to constitute an integral part of the facility. Moreover, the Coker facility is inoperable absent the elbow. Thus, La. C.C. art. 465 directly provides a classification of the elbow as a component part of the Coker facility, without the need to infer qualifying standards such as "societal expectations."
NOTES
[1] Retired Judge William F. Kline, Jr. is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The same exception was filed by Foster Wheeler in litigation involving this incident brought before the United States District Court. In that case, the court maintained the exception and dismissed Exxon's claims against Foster Wheeler. In re Exxon Coker Fire, 108 F.Supp.2d 628 (M.D.La.2000).
[1] After determining that a chandelier was not expressly included in paragraph one as an example of a component part and that it was relatively easy to remove it without substantial damage, the court in Equibank embraced the concept of "societal expectations" to broadly include chandeliers as "electrical installations."
[2] In Coulter, the drilling derrick was welded to the platform.