643 So.2d 256 (1994)
Jay HYMAN, et al., Plaintiffs-Appellants
v.
Richard Franklin ROSS, et al., Defendants-Appellees.
No. 26096-CA.
Court of Appeal of Louisiana, Second Circuit.
September 21, 1994.
*257 Peters, Ward, Bright, Hennessy & Little by Frank Bright, and Hugh T. Ward, Shreveport, for appellants.
J. Peyton Moore, Shreveport, for appellees.
Before NORRIS, LINDSAY and VICTORY, JJ.
VICTORY, Judge.
The seller of heating and air conditioning units installed in a previously mortgaged motel filed a rule to rank its vendor's privilege against the mortgagees' security interest. The trial court found that the heating and air conditioning units were not component parts of the motel, and were not covered by the mortgage. For the reasons stated, we reverse.

FACTS
In 1991 Richard Franklin Ross purchased the Park Inns International Airport motel located at 5215 Monkhouse Drive, Shreveport, Louisiana. Financing for the deal was provided by Jay Hyman, JDH Charitable Trust for Cornell, Beth Hyman, Amvet Management Corp., and Susan Holt (the "Hyman Group").
To secure repayment of the loan, Ross granted a mortgage to the Hyman Group, on May 31, 1991, encumbering the motel and the land upon which it is situated. The mortgage was properly recorded in the mortgage records of Caddo Parish, Louisiana, on May 31, 1991.
As additional security for the loan, Ross gave the Hyman Group a lien on the movable property located at the motel, by way of a security agreement and accompanying financing statement, both dated May 31, 1991. The security agreement was also signed by Joe Grassi, as guarantor.[1] The financing statement and security agreement were both properly recorded in the Caddo Parish mortgage records on May 31, 1991.
In August 1991 and February 1992, Grassi purchased 55 heating and air conditioning units and other equipment from Carrier-Bock Company ("Carrier"), to replace the existing units at the motel.
Following purchase and installation of the heating and air conditioning units, the motel encountered financial difficulties, and Ross defaulted on the loan from the Hyman Group. The Hyman Group filed suit against Ross, and obtained a favorable judgment which it sought to satisfy by way of a sheriff's sale of the collateral, scheduled for November 18, 1992.
On November 5, 1992, prior to the sheriff's sale, Carrier intervened in the foreclosure proceedings, moving for separate appraisal and sale of the heating and air conditioning units. Carrier alleged that Park Inns International d/b/a 5215 Corporation was indebted to it in the amount of $30,385.47, representing a portion of the sales price of the heating and air conditioning units previously purchased. Carrier claimed that its vendor's privilege was superior to that of any other lienholder, including the Hyman Group's.
Carrier's motion was granted, and the units were separately appraised and sold at the November 18 sheriff's sale to the Hyman Group, which was the highest bidder at $16,000.00.
On April 2, 1993, Carrier filed a rule to rank privileges, claiming that its vendor's lien primed any security interest of the Hyman Group. The trial court agreed, finding *258 that the heating and air conditioning units were not component parts of the motel because they could be removed without substantial damage to themselves and the motel. As such, the units were not covered by the Hyman Group's previously recorded mortgage. The trial court also found that Ross did not own the heating and air conditioning units, and that the Hyman Group's security agreement and financing statement did not encumber the movable units. The sheriff's sale of the heating and air conditioning units was deemed null and void since the units were sold for less than the amount owed to Carrier.
The Hyman Group appeals, claiming that the trial court erred in finding that the heating and air conditioning units were not component parts of the motel, and were not covered by the previously executed and recorded mortgage. Alternatively, the Hyman Group claims that the trial court erred in finding that the units were not covered by the security agreement and financing statement. Hyman Group asserts that the units were sufficiently described therein, and that Ross acted as either the owner of the units or had sufficient "rights in the collateral" to create a security interest.

LAW
To determine whether the heating and air conditioning units are component parts of the motel, and covered by the mortgage granted by Ross, we are guided by the precepts set forth in LSA-C.C. Art. 466, as revised in 1978. This provision provides:
Art. 466. Component parts of buildings or other constructions
Things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical or other installations, are its component parts.
Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.
According to two leading Louisiana property law scholars, the two paragraphs of Article 466 are separate and distinct, and should be applied independently to determine whether a particular object is a component part. Professor A. Yiannopoulos explains:
Article 466, first paragraph, declares that things permanently attached to a building or other construction, such as plumbing, heating, cooling, electrical and other installations, are its component parts. Such things are considered to be permanently attached as a matter of law, that is, without regard to the test of the second paragraph of Article 466. Facility of removal is immaterial. The enumeration is merely illustrative. Thus, a steam heating system, a hot water heater, a safe, doors, and a butane gas system may be component parts of a building under the first paragraph of Article 466.
Article 466, second paragraph, determines what constitutes permanent attachment with respect to things not covered by the first paragraph. It declares that things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the thing to which they are attached....
A. Yiannopoulos, Property § 142, at 313, in 2 La.Civil Law Treatise (3d ed. 1991).
Professor S. Symeonides has analyzed Article 466 in a similar manner. Relying on the source provisions for paragraph one (former LSA-C.C. art. 467) and paragraph two (former LSA-C.C. art. 469), Professor Symeonides interprets Article 466 as defining two categories of component parts: (1) those that fit within the illustrative list of paragraph one because they are attached to a building or other construction in a perpetual, rather than a temporary, manner; and (2) those that fit within paragraph two because they are permanently attached to a building or other construction, and cannot be removed without substantial damage to themselves or to the immovable. Symeonides, Property, Developments in the Law, 46 La.L.Rev. 655, 687-690 (1986).
In his examination of paragraph one, Professor Symeonides observed:
However, the word "permanent" in that paragraph [paragraph one] is intended to have a temporal rather than a physical connotation, i.e., permanent as opposed to temporary, not permanent as opposed to *259 loose attachment. While a physically close attachment to, or incorporation into, the immovable usually connotes a certain degree of permanency in the temporal sense, a loose attachment does not necessarily connote lack of permanency. A loosely attached item of the kind enumerated in the first paragraph of current article 466 or sufficiently analogous thereto, may well be viewed by the community as permanently serving the immovable. If so, the item would qualify as a component part of a the building, even when the item is easily removable and thus does not meet the rest of the second paragraph of current article 466. (Emphasis in original.)
Symeonides, Developments in the Law, supra, at 688.
These interpretations of Article 466 have been adopted by the judiciary, with the seminal case being Equibank v. United States, Internal Revenue Service, 749 F.2d 1176 (5th Cir.1985). In that case, the issue was whether several expensive antique chandeliers were component parts of a house, thereby making them primarily subject to mortgage in favor of Equibank, instead of subject to an Internal Revenue Service tax lien. The IRS contended that the chandeliers were not component parts under Article 466 because they could be removed, and in fact had been removed, without substantial damage to themselves or to the immovable.
The court disagreed. It concluded that the chandeliers were component parts under paragraph one of Article 466, since ordinary societal expectations were that the chandeliers were "permanently" attached and would remain indefinitely. The court noted:
The ordinary view of society being a relevant consideration, we conclude our consideration by asking the near-rhetorical question: Does the average, ordinary, prudent person buying a home expect the light fixtures to be there when he or she arrives to take possession? Does that person expect the room to become illuminated when the light switch is thrown or should that person reasonably expect no response to the switch and, upon looking up, reasonably expect to see only a hole in the ceiling with the interior house wiring sticking out of the electrical workbox? In our view, the societal expectation is to have the lights go on.
Equibank, 749 F.2d at 1180.
In its analysis, the court also compared and contrasted various electrical installations, and the degree of knowledge of electricity required for connection and removal. For example, the court contrasted the installation of lamps, toasters, blenders, television sets, etc., by inserting a male plug into a female socket, with the installation of stoves, ovens, central heating and air conditioning units, ceiling fans, etc., by permanent connection to the building's interior wiring system. According to the court, the second group of electrical installations constitute component parts of the buildings or other constructions to which they become attached, regardless of the degree of damage upon removal.
Louisiana appellate courts have also adopted the reasoning employed in Equibank, supra, and have interpreted paragraphs one and two of Article 466 independently. See, e.g., In re Chase Manhattan Leasing Corporation, 626 So.2d 433 (La.App. 4th Cir.1993), writ denied, 630 So.2d 797 (La.1994); Lakeside National Bank of Lake Charles v. Moreaux, 576 So.2d 1094 (La.App. 3d Cir.1991); American Bank & Trust Company v. Shel-Boze, Inc., 527 So.2d 1052 (La.App. 1st Cir.1988), writ denied, 532 So.2d 155 (La.1988).

DISCUSSION
With the applicable legal precepts defined, we now consider whether the trial court erred in ruling that the heating and air conditioning units were not component parts, as defined by Article 466. For the following reasons, we find that the trial court was manifestly erroneous in its conclusion that the heating and air conditioning units were not component parts of the motel because they could be removed without substantial damage to themselves or the building.
At trial, several photographs of the heating and air conditioning units were admitted into evidence. The following photographs, marked Hyman Exhibits 1-D and 2-A, are particularly instructive:
*260 
James Thorpe, the Carrier employee who sold the units to the motel, described the units as being typical of those that are found in motels. He stated that the units in each motel room were installed by sliding them *261 into a hole in the outside wall, which is shown by Hyman Exhibit 2-A. He also testified that the units were placed upon a sub-base, which is also depicted by Hyman Exhibit 2-A. According to Thorpe, the sub-base served two purposes in this situation. First, it housed the electrical connections for the unit and contained a receptacle for floor lamps, and other devices. Second, it functioned as a support base for the unit which was too heavy to be balanced against the motel wall.
Thorpe noted that the sub-base contained two separate electrical boxes. He stated that each of the units was wired to one of these electrical boxes. Thorpe also acknowledged that the electrical wiring contained in the sub-base originated within the motel's concrete foundation.
Michael McClendon Sale, a real estate agent, was qualified as an expert in real estate matters. He testified that he inspected the units and the motel rooms. He also examined the photographs admitted into evidence. According to Sale, an average prudent buyer of commercial property would expect that the heating and air conditioning units at issue would remain with the building.
We agree. As a matter of law, the heating and air conditioning units are component parts of the motel because they fall within the purview of paragraph one of Article 466. The units are "permanently attached" or attached indefinitely to the building. The nature of the attachment is such that reasonable societal expectations dictate that a purchaser of the motel would expect them to remain. This is evidenced by the fact that a large gaping hole would be left in the outside wall of every motel room if the units were removed. Additionally, the units receive their electrical power from the interior wiring of the motel, which runs from the main power source, through the concrete foundation, to each motel room. Attachment is no simple task. On the contrary, it requires skill and expertise in electrical circuitry and wiring.
Having found that the heating and air conditioning units are component parts of the motel, we now turn to whether they are covered by the Hyman Group's mortgage.
Things that become component parts under Art. 466 belong to the owner of the immovable. LSA-C.C. Art. 493.1. Furthermore, the encumbrance of an immovable includes its component parts. LSA-C.C. Art. 469. Finally, with regard to component parts attached to an immovable after the mortgage is granted, LSA-R.S. 9:5391 provides:
A mortgage of immovable property without further action attaches to present and future component parts thereof and accessions thereto, without further description and without the necessity of subsequently amending the mortgage agreement.
Based upon these provisions, it is clear that the heating and air conditioning units are covered by the Hyman Group's previously recorded mortgage,[2] which is superior to Carrier's vendor's privilege.

DECREE
For the reasons stated, the trial court judgment is reversed. All costs are to be borne by Carrier.
REVERSED.
NOTES
[1] The evidence contained in the record does not establish the nature of Grassi's legal relationship with Park Inns International Airport d/b/a 5215 Corporation or Ross.
[2] Our ruling renders moot appellant's alternate contention that the units are also covered by the security agreement and financing statement.