**In re EXXON COKER FIRE**

No. 93–MS–2–B–2.

United States District Court,
M.D. Louisiana.

Aug. 4, 2000.

Richard J. Arsenault, Nesblett, Beard & Arsenault, Alexandria, LA, Anthony David Irpino, Bruno & Bruno, New Orleans, LA, Calvin Clifford Fayard, Jr., Fayard & Honeycutt, Denham Springs, LA, Frank Tomeny, III, Tomeny & Fisher, Baton Rouge, LA, for plaintiffs.

Charles S. McCowan, Jr., Donna V. Yelverton, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, John R. Tharp, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, William R. Hurt, Exxon Company, USA, Law Department, Houston, TX, William Victor Courtney, Louise Van Meter White, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Covington, LA, for Exxon Corporation, defendants.

## RULING ON PEREMPTION ISSUE

POLOZOLA, Chief Judge.

This action arises from a fire that occurred at the Exxon East Coker facility in 1993. Numerous claims have been filed against Exxon Corporation ("Exxon") in this Court seeking damages allegedly sustained as a result of the fire. Exxon filed an answer denying liability. In this same matter, Exxon also filed a third party claim against Foster Wheeler based on Foster Wheeler's design and construction of the East Coker unit. In addition, a companion suit was filed in the 19th Judicial District Court for the Parish of East Baton Rouge, State of Louisiana, involving Exxon and Foster Wheeler.[1] As an affirmative defense in both cases, Foster Wheeler has argued that Exxon's claim against them is barred by the peremptive period set forth in La. R.S. 9:2772. In the state court proceeding, Foster Wheeler asserted this defense by filing an exception of peremption pursuant to LSA C.C.P. art 927. The parties have stipulated that this issue be bifurcated from the other issues in the case and be tried on the merits by this Court.[2] In the federal proceeding, no motion has been filed asserting this defense, however, the parties have agreed to permit this Court to resolve the peremption issue because of its impact on the main demand between the plaintiffs and Exxon in the federal proceeding.

The Court, with consent of counsel, held a joint oral argument with Judge Michael Caldwell of the 19th Judicial District on the peremption exception.[3] After reviewing the briefs, exhibits and arguments of counsel, the Court finds for the reasons which follow: (1) the elbow was a component part of an immovable pursuant to the provisions of the Louisiana Civil Code; and (2) Exxon's claim against Foster Wheeler has perempted under the provisions set forth in La. R.S. 9:2772.

## I. Jurisdiction and Applicable law

This Court has subject matter jurisdiction based on the diversity of citizenship of the parties.[4] Under *Railroad v. Erie Tompkins*[5] and its progeny, this Court is bound to follow state law Consequently, this Court's obligation is to attempt to address this state law issue as a Louisiana state court would address it.[6] When sitting as an *Erie* court applying Louisiana law, this Court's "obligation is to the [Civil] Code, the solemn expression of legislative will."[7] Although Louisiana courts do not technically adhere to the doctrine of *stare decisis,* prior decisions of state courts are instructive "secondary information" for the Court to consider.[8] This Court is also bound to follow the interpretations of Louisiana law by the United States Fifth Circuit Court of Appeals absent some change in state law by the legislature or the Louisiana Supreme Court.[9]

1. 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, Civil Action 408, 409, Division "I."

2. Rec. Doc No. 330. Bifurcation of issues is proper under FRCP Rule 42(b) which permits the court to "order a separate trial of any claim, cross-claim, counterclaim or third party claim or any separate issue * * *."

3. Rec. Doc. No. 363 (May 30, 2000). The Court notes the apparent success of this joint proceeding. Given the identical nature of the evidence and arguments relating to Foster Wheeler's preremption defense, the Court suggested a joint hearing with Judge Caldwell to consider the arguments of counsel. The parties agreed and presented the Court with well prepared briefs and arguments.

4. 28 U.S.C. § 1332(a)(1).

5. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

6. *FDIC v. Abraham,* 137 F.3d 264 (5th Cir. 1998).

7. *Shelp v. National Surety Corp.,* 333 F.2d 431, 439 (5th Cir.1964).

8. *Songbyrd, Inc. v. Bearsville Records, Inc.,* 104 F.3d 773 (5th Cir.1997).

9. *FDIC,* 137 F.3d at 268.

## II. Background

In 1962, Foster Wheeler entered into a contract with Humble Oil, Exxon's predecessor, to build the East Coker facility. This contract obligated Foster Wheeler to provide all process and mechanical engineering services, equipment, labor, design and construction services. In 1962 and 1963, Foster Wheeler constructed the East Coker facility. In 1963, Humble took possession of the facility and began operations.

The Coker facility involves different components. Portions of the Coker are contained *within* a concrete "coker" structure [10] and certain portions, including the piping equipment which is relevant in this case, are located *outside* the concrete facility.[11] The elbow at issue is a part of the pipe "spool" which is also located *outside* the concrete portion of the Coker unit.[12] This elbow is welded to the adjoining piping, although the permanence of the weld is disputed by the parties.

On August 2, 1993, a fire occurred at the East Coker facility. For the purposes of this peremption issue only, the parties agree that an elbow section of the petroleum piping equipment failed and the fire occurred as a result of the failure. The parties further agree that the elbow was originally specified to be made of one material but in fact was erroneously made of a different material than that called for under the terms of the contract.

## III. ISSUES PRESENTED

There are several issues pending before the Court:

1. Is the elbow section of the pipe categorized as immovable property or movable property?

10. Rec. Doc. No. 345 (Exxon/Mobil Findings of Fact), p. 2.

11. Rec. Doc. No. 345, p. 7.

12. Rec. Doc. No. 345, p. 6.

13. This position is implicit in the parties' arguments. The parties argue that either the

2. If the elbow is considered immovable property, have the causes of action against Foster Wheeler perempted based on the language in La. R.S. 9:2772, which limits certain causes of action arising from or relating to immovable property?

## IV. DISCUSSION

### A. Is the Elbow considered an immovable, a component part of an immovable or a movable?

■  Before deciding whether the peremption statute is applicable, the Court must determine whether the elbow itself is an immovable or sufficiently connected to an immovable such that it may be considered a component part of an immovable.

All parties seem to concede that the concrete portions of the Coker unit qualify as immovable property based on their incorporation into the tract of land on which the East Coker sits.[13] The principal dispute here is whether the elbow and the other "petroleum piping" sections are component parts of the Coker facility itself. The Louisiana Civil Code property articles provide a framework for evaluating whether a thing is considered an immovable or a component part of an immovable. In addition, both federal and Louisiana state courts have addressed the issue of what constitutes a component part of an immovable. The Court turns to a discussion of these code articles and the applicable jurisprudence.

### 1. The Civil Code Framework:

In deciding this Louisiana state law issue, the Court must begin with a discussion of the relevant expressions of legisla-

elbow is sufficiently connected to the East Coker to be considered an *immovable* (Foster Wheeler's position) or that the elbow is not adequately part of the Coker and therefore a distinctly *movable* thing so as not be considered an immovable (Exxon). Both arguments recognize that the East Coker unit is itself an immovable.

tive will.[14]   The pertinent articles are found in Book II of the Civil Code in the section dealing with immovable property:

### Art. 462   Tracts of land

Tracts of land, with their component parts, are immovables.

### Art. 463   Component Parts of Tracts of Land

Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruits of trees, are component parts of a tract of land when they belong to owner of the ground.

### Art. 464   Buildings and standing timber as separate immovables

Buildings and standing timber are separate immovables when they belong to a person other than the owner of the ground.

### Art. 465   Things incorporated into an immovable

Things incorporated into a tract of land, a building, or other construction, so as to become an integral part of it, such as building materials, are its component parts.

### Art. 466   Component parts of buildings or other constructions

Things permanently attached to a building, or other construction, such as plumbing, heating, cooling, electrical, or other installations, are its component parts.

Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.

To qualify as an immovable under these articles, the elbow must either: (a) be a building or other construction permanently attached to the ground and belong to the owner of the ground (art. 463); or (b) be a component part of an immovable (art 465 and 466).

Although the Coker device itself is undoubtedly an immovable under article 463, the petroleum piping equipment does not seem to be permanently attached to the ground within the terms of article 463.  If the elbow is to be considered an immovable, it must fall within the provisions of article 465 or 466, articles 465 and 466 should be read *in pari materia* when determining whether a thing is a component part of an immovable.[15]  To be considered a component part of an immovable under article 465, the thing must be "incorporated into the immovable," and become an "integral part" of the immovable.  The Revision comments to article 465 suggest that an incorporation may be found when an otherwise movable thing loses its separate identity or becomes an integral part of the immovable.[16]

Article 465 has some relevance to the facts of this case.  However, the Court believes that the proper analysis of whether this elbow can be considered an immovable and therefore fall within the confines of La. R.S. 9:2772, should be made under article 466.  This position is supported by the Fifth Circuit.[17]

### 2.   Interpretation of Civil Code Article 466

The proper interpretation of article 466 has spawned much debate in both judicial

---

14.   La.Civ.Code. arts. 1, 2.

15.   *Prytania v. General Star Indemnity,* 179 F.3d 169 (5th Cir.1999) (court looked at both articles 465 and 466 in evaluating whether the furniture involved was a component part of the immovable, the hotel).

16.   Comment(c), La. C.C. art. 465.  Professor Yiannopoulos describes the scope of article 465 saying, "article 465 contemplates things that are fully incorporated into a tract of land, a building, or other construction so as to

become an integral part of it, such as building materials."  A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE, PROPERTY § 142.5 (2000 POCKET PART).

17.   Article 466 provides "the sole framework within which to determine whether additions or equipment attached to building can be considered a part of that building * * *."  *Coulter v. Texaco, Inc.,* 117 F.3d 909, 915 (5th Cir.1997).

and academic circles. This article applies to things that, though not considered immovable because of their incorporation into a building or other construction (as defined in article 465), are considered immovable as component parts because of their "permanent attachment to the building or other construction."[18]

The first paragraph of this article contains two elements. First, a component part must be permanently attached. The term "permanent attachment" refers to the length of time which the thing has been attached as opposed to how the thing is attached in a physical sense.[19] Second, the component part must fall within the "ejusdem generis" list of items which are considered component parts of immovables.[20]

The second paragraph of the article also makes reference to "permanent attachment." Recently, there has been some dispute as to whether an item that falls within the first paragraph (i.e. a listed item or an item similar to a listed item), must *also* satisfy the requirements of the second paragraph which provides:

> Things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the immovable to which they are attached.

For example, if the issue was whether a portion of an air conditioning system was a component part of an immovable, the question would be whether the thing was a component part simply by being listed in the first paragraph, or whether the Court should further inquire into the damage caused upon removal. Various academicians have concluded that the second paragraph of article 466 contains a different definition for permanent attachment than the first paragraph and refers to a different group of things than those listed in the first paragraph.[21]

### 3. Equibank: An Important Starting Point

*Equibank v. IRS* is a seminal case regarding the proper interpretation of article 466.[22] In this case, the Fifth Circuit ruled that electrical chandeliers were component parts of an immovable "despite the fact that they could be removed without substantial damage to the chandeliers or the residence."[23] The Court's decision discussed the opinion of a noted property law scholar and his interpretation of article 466.[24] The court summarized the Profes-

---

18. YIANNOPOULOS, at 142.5, p. 37.

19. According to Professor Symeonides, this phrase is "intended to have a temporal rather than a physical connotation, i.e. permanent as opposed to temporary, not permanent as opposed to loose attachment. While a physically close attachment to, or incorporation into the immovable usually connotes a certain degree of permanency in the temporal sense, a loose attachment does not necessarily connote lack of permanency." Developments in Business Law, 46 La. LR 655, 687 (1986).

20. "Ejusdem generis" refers to a list followed by a general word or phrase which should be considered in light of those specific things listed. Article 466 says "plumbing, heating, cooling, electrical, or other installations." Under this cannon of interpretation, "other installation" should be read to include things of the same type as those listed. See *Prytania*, 179 F.3d 169, 181.

21. Professors Yiannopoulos and Symeonides, as well as many federal and state courts take the position that the paragraphs can operate *independently* of each other. Symeonides bases his opinion in part on an historical analysis of the article. He reports that paragraphs one and two of the present article 466 are derived from separate articles in the Louisiana Civil Code of 1870 and therefore refer to different items. Symeonides, 46 La LR at 687. According to the Professor, the drafters of the revised article intended for the paragraphs to be construed independently of each other. However, a recent Fifth Circuit case has cast some doubt on this conclusion. *Prytania v. General Star Indemnity, supra.* This case, as well as other federal cases, will be discussed later in this opinion.

22. 749 F.2d 1176, 1179 (5th Cir.1985).

23. 749 F.2d at 1179.

24. Professor A.N. Yiannopoulos testified as an expert in the *Equibank* trial.

sor's position saying, "the Professor was of the opinion that under article 466 items are component parts of a building or other construction: (1) if they fit within one of the categories listed in the first paragraph of the article, in which event they are considered permanently attached as a matter of law, or (2) if they are actually permanently attached as described in the second paragraph." [25] A key component of the *Equibank* analysis is the "societal expectations" test announced by the Court. To determine whether an item falls within the illustrative list in the first paragraph of article 466, the Court must ask whether an ordinary person would expect the thing to be part of the building. In *Equibank*, the Court concluded that the average person would consider the chandeliers to be "permanently connected" to the house. Therefore, the chandeliers would be considered a component part of the house under the first paragraph of article 466.[26] The Court found the chandeliers to be component parts as a matter of law without inquiring into whether the chandeliers or the residence would be damaged if removed.

*Equibank* has been followed by both federal and state courts. The Court now turns to a discussion of these cases.

### 4. Federal Court Cases on Component Parts after *Equibank*

Shortly after *Equibank* was decided, the Fifth Circuit decided another case which broke the component part analysis into a five factor test. In *EPA v. NOPSI*, the Court considered whether three electrical transformers contained in a brewery building were component parts of the immov-able owned by the building's owner or movables owned by the utility company.[27] The Court decided the transformers were component parts of the building after applying the following five part analysis drawn from *Equibank*:

- **To be an immovable, the transformers must have been a component part of an immovable.**

- **To be a component part of the immovable, the transformers must have been permanently attached as matter of fact.[28]**

- **Certain items are considered component parts as a matter of law if they are so classified under the first paragraph of article 466.**

- **Whether society would view the transformers as electrical installations and therefore component parts under article 466's illustrative list.**

- **The degree of skill needed to install and disconnect the transformers.**

In a later case, *Coulter v. Texaco, Inc.*, the Fifth Circuit had to determine whether a drilling rig was a component part of a drilling platform and therefore immovable property.[29] In affirming the district court decision, the Court found that the rig was not a component part of the immovable (the platform) by considering both the first and second paragraphs of article 466. As to the societal expectations test associated with the first paragraph, the Court wrote,

> We conclude that, to paraphrase the language of *Equibank*, the average, ordinary, and prudent business entity that was buying or, alternatively, taking a security interest in, an offshore drilling

25. 749 F.2d at 1178. Yiannopoulos also testified: "The first paragraph considers, are meant to consider, these things as component parts as a matter of law as to which the test of permanent attachment would be immaterial." *Id.*

26. 749 F.2d at 1179. See also Yiannopoulos, § 142.5, where he writes the "Court declared that 'societal expectations' *must* be considered when determining which things the legislature mean to be included in the listed categories of the first paragraph of article 466."

27. 826 F.2d 361 (5th Cir.1987).

28. Under the second paragraph of article 466 focusing on the method of attachment, the ease of disconnecting the transformers and the damage to the building upon removal are factors to be considered.

29. 117 F.3d 909 (5th Cir.1997).

platform would not expect, in the absence of specific contractual provisions to the contrary, an extremely costly drilling rig, one of the heaviest and most sophisticated pieces of industrial equipment in use currently, to be (1) perpetually attached to the platform as a component part when the buyer took possession or (2) a permanent part of that platform when the lender obtained its security interest. To conclude otherwise would fly in the face of economic reality and long held contractual expectations of an entire industry.[30]

The Court also considered whether removal of the rig from the platform would cause substantial damage to either the platform or the rig itself under the second paragraph of article 466. According to the Fifth Circuit, the rig did not qualify as a component part under this test either. The Court wrote,

> Although the scope of these repairs and renovations to the platform and Dual 25 may well be "substantial" on an absolute basis, they are certainly negligible relative to these two multi-million dollar structures. Moreover, the Coulters have presented no evidence that the anticipated removal of Dual 25 will cause it or Texaco's platform to sustain any enduring "damage" in the sense that either will thereafter become functionally impaired on a permanent basis. Indeed,

the repairs and renovations that both the rig and the platform will require upon the former's removal cannot be considered, in the particular circumstances of this case, anything but a form of ordinary and entirely expected maintenance. Accordingly, we conclude that Dual 25 cannot qualify as a component part of Texaco's platform under the second paragraph of article 466.[31]

In *Moll v. Brown and Root,* Judge Clement considered whether an exterior muffler attached to a seven story furnace on a concrete base was a component part of an the furnace.[32] She concluded the muffler was a component part because "an ordinary and prudent business entity would expect the muffler to be there upon taking possession." [33] Judge Clement acknowledged the apparent logic in reading both paragraphs of article 466 together.[34] However she recognized that both the jurisprudence (principally *Equibank)* and academic opinion (principally Yiannopoulos) mandated reading the paragraphs independently.[35]

Other federal Court cases appear to at least follow the reasoning in *Equibank* without always citing it.[36]

### 5. State Court cases after *Equibank*

Two separate state courts of appeal have rendered opinions which are applicable to the issues presented in this case.

---

30. *Coulter,* 117 F.3d at 917.

31. *Coulter,* 117 F.3d at 917.

32. 1999 WL 155948 (E.D.La.1999).

33. 1999 WL 155948, at *5.

34. 1999 WL 155948, at *3.

35. Judge Clement's initial thought process was as follows: the first paragraph lists examples of things which are permanently attached (heating, air, etc) and the second paragraph appears to contain a definition of when a thing is permanently attached. As discussed previously, this interpretation is *not* consistent with the Fifth Circuit's opinions nor the scholarly writings. After considering this analysis, she then rejected it.

36. *Miller v. Slam Offshore,* 49 F.Supp.2d 507 (E.D.La.1999) (genuine issues of material fact precluded summary judgment; however, proper analysis under article 466 *would be* to examine thing under both paragraphs of article 466 while essentially applying *Equibank* test); *Dupre v. Chevron,* 913 F.Supp. 473 (E.D.La.1996) (drilling rig not component part of drilling platform because rig was easily removable from platform without damage to platform; parties never contemplated that rig was permanent; there was no damage to drilling rig itself upon removal); *Boggs v. Atlantic Richfield Company,* 720 F.Supp. 72 (E.D.La.1989) (movable oil drilling rig was not part of platform because rig was never fastened, bolted, braced, or welded to platform and was removed with out substantial damage to itself or platform).

In *American Bank and Trust v. Shel-Boze, Inc.*[37], the Court found that light fixtures and carpeting had become component parts of a building. Following the reasoning in *Equibank*, the First Circuit found that a reasonable person buying a residence expects to find finished flooring as well as lighting fixtures when the buyer takes possession.[38] As a result, the court concluded that the fixtures met the definition for component parts in article 466.

In *Hyman v. Ross*, the Second Circuit ruled that heating and air units located in a motel were component parts of the building under article 466.[39] The Court found that the units were component parts under the first paragraph of article 466 because they were "permanently attached or indefinitely attached to the building."[40] In addition, the Court found that "societal expectations" would dictate that a purchaser of the hotel would expect the units to remain and that attachment of the units "requires skill and expertise in electrical circuitry and wiring."[41]

Other state court cases seem to following the reasoning forth in *Equibank*.

### 6. Effect of Prytania v. General Star:

A recent Fifth Circuit Court of Appeals opinion may cast doubt on *Equibank* and the "societal expectations" inquiry related to article 466. In *Prytania v. General Star Indemnity Company*, the Court considered whether custom made furniture attached to the walls of a hotel were component parts of the building or simply movable property.[42] The Court concluded that the furniture was not permanently installed and therefore was not a component part of the immovable.[43] Although *Prytania* does not specifically overrule *Equibank's* use of the "societal expecta-tions" test, *Prytania* does appear to cast some doubt on whether this test should be used to evaluate article 466. The Court was also critical of Professor Yiannopoulos's theory:

Notwithstanding the unambiguous wording of the revised version of article 466, the Professor urged the district court to hold that as a matter of law the antique chandeliers were not component parts of the mansion in which they had been installed but remained movable property. He did so, though, not by demonstrating that neither the chandeliers nor the ceilings of the mansion had suffered "substantial damage" during the course of removal. Rather, the Professor posited that, because of "societal expectations," such high-ticket items would not be expected by the hypothetical buyer or seller of such a mansion, or by the borrower or lender of a loan secured by a mortgage on such a mansion (or, we suppose, by the insurer or insured of such a mansion) to be component parts of the mansion, regardless of the permanence or impermanence of the attachment of such chandeliers. From our opinion in Equibank, we get the impression that the Professor had opted to disregard the concept of permanent attachment as embodied in the plain wording of article 466 (a concept that presumably favored his client, given the apparent dearth of trial evidence of "substantial damage" to the chandelier or the mansion during removal) and to ground his advocacy instead on "societal expectations." He did so by an imaginative parsing of this article to visualize an otherwise invisible disjunctive between the article's first and second paragraphs. [FN34] Without even adverting to the *182 significance of the non-exclusive

---

37. 527 So.2d 1052 (La.App.1st Cir.1988).

38. 527 So.2d 1052, 1054 (La.App.1st Cir. 1988).

39. 643 So.2d 256 (La.App.4th Cir.1994).

40. 643 So.2d at 259.

41. 643 So.2d at 259.

42. 179 F.3d 169 (5th Cir.1999).

43. 179 F.3d at 179.

nature of the ejusdem generis list in the first paragraph of article 466 ("such as plumbing, heating, cooling, electrical or other installations"), the Professor cum expert witness interposed his take on the article: (1) Movables falling into one of the first paragraph's four nominate categories of installation are component parts as a matter of law, irrespective of the nature or extent of their attachment to the structure; (2) all installed movables other than plumbing, heating, cooling, or electrical are to be tested under the second paragraph of article 466 for permanence of installation hinging on whether they can "be removed without substantial damage to themselves or to the immovable to which they are attached." [44]

As professor Yiannopolous himself pointed out, the Court's critique of the societal expectations test in *Prytania* may be *obiter dicta* because the Court found the furniture involved did not satisfy either the societal expectations test or the substantial damage standard also contained in article 466. [45] The panel's language may support this position:

It is immaterial for purposes of today's alternative task... whether we begin our testing under (1) the plain wording of article 466 (which looks solely to the extent of collateral damage that would result from removal), or (2) the Professor's creative "societal expectations" test (which, by his own testimony in Equibank, applies only to plumbing, heating, cooling or electrical installations, and leaves all "other" installations to be tested for the permanence of attachment under the second paragraph of article 466 and its "substantial damage test") [46]

After *Prytania,* several interpretations of *Equibank* and the societal expectations test appear to exist:

(1) The critique of the "societal expectations" test in *Prytania* does not directly overrule *Equibank* because the Fifth Circuit did not analyze whether the furniture was a component part under the first paragraph of article 466 and, therefore, did not reach the "societal expectations" test associated with that paragraph; or

(2) *Prytania* stands for the position that the ultimate question about whether a thing is a component part under article 466 is whether "substantial damage" would occur upon removal. The societal expectations test *could* still be a relevant part of the analysis, however; or

(3) The societal expectations test (at least as a matter of Louisiana law as interpreted by the Fifth Circuit) is a dead issue and should not be considered under article 466. Foster Wheeler suggests this position may be adopted by the Court, saying "this Court could conclude *Prytania Park* requires a literal interpretation of article 466, without resort to any societal expectations inquiry." [47]

## 7. Application of Law to Facts

The Court finds that the elbow is a component part of an immovable under the requirements set forth in article 466 of the Louisiana Civil Code.

The Court does not need to resolve the question of whether an item must satisfy both paragraphs of article 466 or whether an item which does not fit in the illustrative list of the first paragraph may be still be considered a component part under the second paragraph. In this case, the Court finds that the elbow at issue satisfies the requirements of both the first and second paragraphs of article 466. Therefore, the

---

**44.** 179 F.3d at 181. Foster Wheeler argues that *"Prytania* requires a literal interpretation of article 466, without resort to any 'societal expectations' inquiry". Rec. Doc. No. 370, p. 10.

**45.** § 142.5, p. 40–41.

**46.** *Prytania,* 179 F.3d at 182.

**47.** Rec. Doc. No. 370, p. 10.

elbow qualifies as a component part of the East Coker structure as a matter of law under the facts of this case.

In addition, it is not necessary for the Court to determine the fate of the "societal expectations" test after the Fifth Circuit's opinion in *Prytania*. The Court finds that if this test is used as an element of the Court's decision, a reasonable person would expect this elbow to be a component part of the East Coker unit. However, if the Court excludes "societal expectations" as a factor in its decision, the Court finds that the elbow qualifies as a component part of an immovable under article 466.

Exxon strenuously argues that the elbow does not fall within the "plumbing" category listed in article 466. Specifically, Exxon argues:

> They [the elbow and other spool items] are not "plumbing" as Foster Wheeler has, in the past, erroneously argued, as there is a fundamental difference between "petroleum refining piping" and "plumbing" as recognized by industry codes and experts. (Citations omitted).[48]

Exxon relies on numerous depositions, reports, and industry handbooks as evidence to support its contention that the elbow cannot qualify as plumbing.[49] The Court agrees with Exxon's contentions and finds that the elbow does not qualify as plumbing. Specifically, the Court finds the elbow is not plumbing because the elbow: (1) fits within a distinct category of items which is governed by a different industrial code than ordinary plumbing fixtures; (2) is considered a distinct item in the mechanical engineering community; and (3)

serves a different purpose than plumbing fixtures traditionally used for human habitation and use.

It is clear the Court may find that the elbow falls within the first paragraph of article 466 even if it does not precisely fit within the plumbing category in article 466. It is also well established that the list in article 466 is merely illustrative of those things that may be component parts. Although the plumbing label may not apply under the facts of this case, the Court finds the "other installations" category is sufficiently broad to include the piping elbow involved in this case.[50]

Under the *ejusdem generis* maxim, the elbow must be sufficiently similar to those specific items listed in the first paragraph to qualify as an "other installation."[51] The Court finds the elbow is sufficiently similar to plumbing for several reasons. First, like plumbing fixtures traditionally associated with human use and habitation, this elbow is part of a closed system. Sections of the piping equipment, including the elbow at issue, must be in place in order for the piping equipment to fulfill its function. Second, the elbow and the other petroleum equipment is used to transport material in a similar fashion to traditional plumbing. Admittedly, the elbow at issue here is not used to conduct water and raw sewerage, but the elbow's use is sufficiently similar to that of traditional plumbing fixtures. Third, both the elbow and plumbing fixture used to conduct water and sewerage are "active" and "functioning" pieces of equipment when viewed in relation to the East Coker device.[52] For these reasons,

---

**48.** Rec. Doc. No. 346, p. 9 (Exxon Memorandum in Support).

**49.** Rec. Doc. No. 345, p. 5 (Exxon Proposed Findings of Fact).

**50.** If the Fifth Circuit rule is that items which fit into the first paragraph are component parts as a matter of law, then this would end the court's inquiry without the necessity for determining what damage would occur on removal.

**51.** *Prytania*, 179 F.3d at 178.

**52.** In *Prytania*, the Fifth Circuit noted the active nature of the items listed in article 466. The Court wrote, "Each type of installation is some kind of actively functioning machinery or equipment. In contrast, the items that comprise the furniture are passive, non-functioning articles." 179 F.3d at 178.

the Court finds that the elbow is sufficiently similar to those items listed in article 466 and, therefore, qualifies as an "other installation."

The first paragraph also requires that the thing be permanently attached. As discussed previously, the phrase "permanent attachment" as used in the first paragraph of article 466 is probably a temporal reference as opposed to a physical one.[53] The elbow at issue here has been in place since the Coker structure was built, a period of nearly forty years. The Court finds that an attachment of forty years satisfies the permanent attachment requirement of the first paragraph of article 466.

Because the elbow qualifies as an "other installation," the Court now considers the requirements of the second paragraph of article 466.[54] Under the second paragraph, things are considered permanently attached if "they cannot be removed without substantial damage to themselves or to the immovable to which they are attached."[55] The question of whether removal damage is substantial is a fact-intensive determination which must be decided in the context of the case.[56] Based on the facts of this case, including the numerous exhibits presented by the parties, the Court finds that substantial damage would occur to both the elbow and the East Coker device if the elbow were removed.

1.  *Removal of the elbow would cause substantial damage to the elbow and the surrounding pipe*

Removing the elbow would require a more complex procedure than simply unscrewing a piece of pipe and extracting it.

Removal would result in damage to both the elbow and the adjoining pipe. The damaged elbow section would have to be cut out of the pipe structure using a welding torch.[57] In addition, the existing pipe would also require preparation in order to receive a new elbow section. Foster Wheeler argues the edges of the existing pipe would have to be "beveled to an angle of 37 degrees" before inserting the new elbow. This procedure stands in stark contrast to the ease by which the furniture could be removed in the *Prytania* case. In that case, the Fifth Circuit noted that the furniture "could be easily removed from the hotel by detaching bolts, and that removing the furniture would not substantially damage either the furniture or the building."[58]

Exxon argues removing the elbow would not cause substantial damage to the adjacent pipe because the removal of refinery piping is a form of "ordinary and entirely expected maintenance."[59] According to Exxon, it is common practice in the refinery industry to cut out sections of pipe similar to the elbow that failed in this case.[60] The Court is not persuaded by this argument. The mere fact that a section of pipe *can* be removed and that industry may expect that it will eventually be removed does not negate the damage caused upon removal or the complexity of removing the pipe. This argument is tantamount to arguing that a residential roof is *not* a component part of an immovable because the owner expects to replace the roof at some point during his or her ownership of the home. The roof is no less a component part of the building structure

---

53.  Supra, at note 11.

54.  Under the Fifth Circuit's analysis in *Prytania Park*, an item's status as a component part of an immovable ultimately hinges on whether "substantial damage" would occur upon removal. 179 F.3d at 182.

55.  La. Civ.Code art. 466.

56.  *Prytania*, 179 F.3d at 182, FN 37.

57.  Rec. Doc. No. 369, Finding of Fact # 41, Foster Wheeler Deposition Designations, Exhibit E8, p. 34–36; Exhibit E7, p. 60.

58.  179 F.3d at 179.

59.  Rec. Doc. No. 346, p. 12.

60.  Rec. Doc. No. 345, Exxon Proposed Findings of Fact # 31; Exhibit E1–B, Exhibit E1–C.

than is the elbow a component part of the East Coker.

Although Exxon argues that removal and replacement are common place in the petroleum industry, industrial expectations may be just the opposite. Namely, pipe equipment may only be replaced on an "as needed" basis when worn out or corroded as opposed to being routinely replaced.[61] Exxon concedes that it may have subjectively intended to leave the failed elbow in place indefinitely.[62] This fact does not on its own establish that the elbow is a component part, however it is relevant to industrial community's expectations about repair and replacement.

### 2. *Removal of the elbow would cause substantial damage to the East Coker device.*

Under article 466, the substantial damage question involves not only the component part itself, but also the immovable to which it is attached. Accordingly, the Court must examine the effect of removing the elbow on the East Coker device. Foster Wheeler argues the East Coker could not function without the petroleum piping in place.[63] In order to replace sections of the East Coker pipe, Foster Wheeler maintains that the East Coker would have to "be partially shut down, because it would not be capable of processing new coke until the elbow was replaced and the system was brought back on line." [64] Exxon argues that the Court should not focus on whether the Coker can operate when the elbow is removed, but rather that the industry expects repairs to be made during plant "turnarounds" and other scheduled maintenance.[65] Additionally, Exxon offers numerous reports and deposition designations which purport to establish that the Coker could continue to function during repairs.[66]

The reports and designations cited by Exxon do not unanimously support the position that the Coker could continue to run without the elbow or while the elbow was being replaced. For example, a report submitted to Exxon by an consultant states "theoretically, if valves had been installed at their junction with the master feed line, the pipe section could have been shut off and replaced without any impact on normal operations." [67] Exxon submitted no evidence that any such valves were installed prior to the fire. In addition, Exxon submitted the deposition of a former Exxon project engineering employee who acknowledged that pipe is replaced during "shutdowns" of the entire unit.[68] Other evidence indicates that if the elbow

---

**61.** Rec. Doc. No. 369(Foster Wheeler Findings of Fact and Conclusions of Law) # 35, 36.

**62.** Rec. Doc. No. 346, p. 9. Exxon argues that its subjective intent to leave the elbow in place is not relevant to the issues presented to the Court. Professor Yiannopoulos concurs with this position. He writes: "The second paragraph ... declares that things are considered permanently attached if they cannot be removed without substantial damage to themselves or to the thing to which they are attached. This is an objective test; the intent of the owner of the building or other construction is immaterial." YIANNOPOULOS, § 142.

**63.** Rec. Doc. No. 369, Findings of Fact # 's 38, 39, 40.

**64.** Rec. Doc. No. 369, Findings of Fact # 's 38, 39, 40.

**65.** Rec. Doc. No. 346, p. 12.

**66.** Exxon refers the Court to its Proposed Findings of Fact, Rec. Doc. No. 345.

**67.** Exxon Exhibit E–2B.

**68.** Exxon Deposition Designation No. 1 (James Stegall), p. 19, lines 9–15. This position is consistent with other deposition testimony submitted by Exxon. Helmut Thielshch, a petroleum engineering consultant, testified that the coker unit would not be "running" at all during a turnaround. Exxon Deposition Designation No. 11, p. 82, lines 1–19. Presumably, the coker could not fulfill its industrial function and produce coke during this period when the unit is completely shutdown.

was removed, the Coker could continue to run only if other repairs were performed.[69]

Exxon attempts to characterize the removal of the elbow as ordinary and expected maintenance of the East Coker facility. In attempting to do so, Exxon analogizes the facts of this case to the facts presented in *Coulter v. Texaco*.[70] In *Coulter*, the Fifth Circuit addressed the issue of whether a drilling rig which was welded to an offshore platform and was subsequently removed, was a component part of the platform. The Court noted that the drilling rig had been used on five different platforms over a period of fifteen years and was scheduled to be moved off the Texaco platform.[71] Based on industry custom, the Court found that the repairs to the platform after removing the rig were only ordinary and entirely expected maintenance. The Court concluded the damage caused to the rig was not "substantial" because of the routine and expected nature of the repairs. Exxon argues that replacing the elbow and other petroleum piping sections is likewise "nothing but... 'an ordinary and entirely expected maintenance' " of the Coker device.[72]

The Court does not believe the conclusion reached by the Fifth Circuit in *Coulter* applies to the facts of this case. Exxon argues that damaged sections of pipe can be replaced at turnarounds and shutdowns, citing industry practices. According to Exxon, any damage sustained by the Coker by removing the elbow cannot be characterized as "substantial" because of this industry practice. Exxon fails to offer sufficient proof to establish the repairs and removal of pipe sections allegedly done in this case are similar to those discussed in *Coulter*. In *Coulter*, the repairs were characterized as ordinary maintenance because the rig was moved (and the resulting repairs made) at regular and predictable intervals. Exxon offers no evidence that the components of the piping equipment or the elbow were removed at regular and predicable intervals consistent with the "ordinary and expected maintenance" done in the *Coulter* case. In fact, the elbow in this case had not been removed or replaced since it was originally installed. As a result, the Court concludes that the kinds of repairs envisioned by the *Coulter* opinion were not performed by Exxon under the facts of this case. Accordingly, the repairs cannot be characterized as ordinary and expected. The Court further finds that leaving a section of pipe in place until it fails is consistent with characterizing a thing as a component part as opposed to regular and scheduled removal of a thing for repair or replacement.

## B. Applicability of La. R.S. 9:2772:

The Court now considers the applicability of La. R.S. 9:2772.[73]

### 1. Statutory language:

La. R.S. 9:2772 limits the time period during which certain actions relating to immovable property may be filed. In pertinent part, the statute provides [74]:

cently in 1999, the Louisiana Legislature reorganized and renumbered certain sections of the statute. Of particular importance in this case, the Legislature redesigated subsections of Section (A) of the statute. This change did not affect the substance of the sections, however. Foster Wheeler cites the pre-revision sections of the statute, while Exxon cites the post revision sections. For ease of reference, the Court will refer to the post–1999 renumbering of the statute.

---

69. Exxon Deposition Designation No. 12, (Don Edwards), p. 42, lines 11–18 ("blind flanges" would have to be installed to isolate the damaged section of pipe in order for the coker to continue to run).

70. Rec. Doc. No. 346, p. 10–12; 117 F.3d 909, 917 (5th Cir.1997).

71. 117 F.3d at 916.

72. Rec. Doc. No. 346, p. 12.

73. This statute has been amended several times since its enactment in 1964. Most re-

74. Emphasis added.

A. **No action,** whether ex contractu, ex delicto, or otherwise, including but not limited to an action for failure to warn, to recover on a contract, or to recover damages **shall be brought against any person performing or furnishing land surveying services,** as such term is defined in the first paragraph of R.S. 37:682(9), including but not limited to those services preparatory to construction, **or against any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of immovables, or improvement to immovable property:**

(1)(a) **More than seven years after the date of registry in the mortgage office** of acceptance of the work by owner.

(b) **If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than seven years** after the improvement has been thus occupied by the owner

(2) **If the person performing or furnishing the land surveying services,** as such term is defined in the first paragraph of R.S. 37:682(9), does not render the services preparatory to construction, **or if the person furnishing such services or the design and planning preparatory to construction does not perform any inspection of the work, more than seven years after he has completed the surveying or the design and planning with regard to actions against that person.**

2. Arguments

According to Foster Wheeler, the peremptive period found in § 2772 applies under the facts of this case because: (1) Foster Wheeler designed and constructed the East Coker device[75]; (2) the failed elbow is a component part of the East Coker immovable and, therefore, considered an immovable itself; and (3) Exxon's predecessor took possession of the East Coker in 1963.

Exxon argues that even if all of the elements of § 2772 are met, the peremptive period contained in the statute was not triggered under the facts of this case. According to Exxon, Foster Wheeler performed various on-site inspections and discussions of the East Coker device after it was constructed which triggered an exception to the peremptive period.[76] In essence, Exxon argues that even if Foster Wheeler falls within the scope of § 2772, the peremptive period was continuously suspended from the time the East Coker was constructed until at least May, 1987. Foster Wheeler disputes the existence of any exception to the peremptive period in § 2772 Foster Wheeler also argues that the subsection pertaining to inspections only applies when the peremptive period begins to run in favor of land surveyors who do not render services preparatory to construction and designers who do not perform inspections. In attempting to explain the proper interpretation of the statute. Foster Wheeler argues:

> Thus, in the event an individual performs land surveying services or design services only, the period begins to run at the time he or she completes his or her work. For example, if an architect designed a building but provided no further services, the peremptive period would begin to run in his or her favor upon completion of the services, and not upon ultimate completion of the construction by the builder. To the contrary, and quite clearly, the peremptive

---

75. Exxon concedes that Foster Wheeler both designed and constructed the East Coker. Exxon Findings of Fact # 3, Rec. Doc. No 345. See also Foster Wheeler Findings of Fact # 's 1 and 2, Rec. Doc. No. 369.

76. Exxon claims that Foster Wheeler performed these inspections of "the soundness and/or operability of the East Coker and related piping on numerous occasions between February 24, 1964 and May, 1987." Rec. Doc. No. 346, p. 17.

period with regard to one who actually constructs an improvement to immovable property begins, at the latest, on the date the owner occupies the improvement.[77]

### 3. Analysis

■ La. R.S. 9:2772 is clearly a statute of peremption.[78] Statutes of prescription and peremption both limit the availability of a legal remedy. However they are distinguishable concepts. Prescriptive periods bar "the remedy sought to be enforced and terminate the right of access to the courts for enforcement of the existing right."[79] By contrast, peremptive periods "totally destroy the previously existing right so that, upon expiration of the statutory period, a cause of action or substantive right no longer exists to be enforced."[80] Peremptive periods cannot be interrupted or suspended.[81]

■ The Court finds that there is no "inspection" exception contained in La. R.S. 9:2772 as suggested by Exxon.[82] First, Exxon's proposed interpretation would eviscerate the legislative intent of the statute. By using the term "peremptive" as opposed to "prescriptive", the legislature made a deliberate decision to subject the applicable time periods in this statute to the rigors of the peremption doctrine. Under this doctrine, the peremptive period cannot be interrupted or suspended. In effect, Exxon argues that its cause of action against Foster Wheeler has been suspended for nearly forty years because of Foster Wheeler's on-going contact with Exxon and the Coker facility. This interpretation is inconsistent with the intent of the legislature and contrary to commonly understood interpretation of peremptive periods.

■ Even assuming *arguendo* that an exception to § 2772 exits, the Court finds that none of Foster Wheeler's activities constitute an "inspection" as the term is used in the statute. Exxon offers a number of internal Foster Wheeler memoranda, letters, reports and lecture notes in support of its argument.[83] Assuming an inspection exception even exists, the Court finds that none of these documents suggest an inspection of the failed elbow was ever made by Foster Wheeler. Virtually all of these documents relate to new Foster Wheeler construction or additions to the Coker facility at Exxon.[84] Some of the documents are excerpts of reports provided by Foster Wheeler to its other customers which document Foster Wheeler construction activities around the country, including the East Coker facility.[85] None of these activities fall within the logical interpretation of the term inspection. In the context of the statute, the term inspection refers to a an inspection of the work completed. Unrelated evaluations or cursory discussions of the previously completed work do not qualify as inspections. The purpose of the statute is to regulate causes of action relating to the surveying, design or construction of the immovable itself. By the same token, the inspection must be related to the sur-

---

**77.** Rec. Doc. No. 370, p. 15. (Foster Wheeler Memorandum)

**78.** Id., *See also KSLA–TV, Inc. v. Radio Corporation of America*, 732 F.2d 441 (5th Cir. 1984); *Lasseigne v. Schouest & Sons, Builders*, 563 So.2d 371 (La.App.1st Cir.1990).

**79.** La. Civ.Code art. 3447; *KSLA,-TV*, 732 F.2d at 442, citing *Pounds v. Schori*, 377 So.2d 1195, 1198 (La.1979).

**80.** La. Civ.Code art. 3458; *KSLA–TV*, 732 at 442; *See also Tharpe and Brooks, Inc. v. Arnott Corp.*, 406 So.2d 1, 5 (La.App.1981).

**81.** La. Civ.Code art. 3461.

**82.** To date, there are no federal or state court cases directly discussing the proper interpretation of the term "inspection" as used in the statute.

**83.** Rec. Doc. No. 346, p. 17–18.

**84.** Exxon Exhibits: E–42; E–44; E–45; E–47; E–51; E–52; E–53; E–55.

**85.** Exxon Exhibit E–59.

veying, design or construction performed. Exxon failed to establish that the inspections involve the design and construction work completed in 1962–1963. For example, Exxon relies on a 1963 field report by Foster Wheeler.[86] The report purports to document inspections of the East Coker by Foster Wheeler. The scope of the report involves "the construction and operation of the Petroleum Coking Unit" built by Foster Wheeler.[87] Further reading reveals the report is only a prospective analysis of potential changes to the Coker facility. The report says, "These suggestions apply specifically to the Coking Unit but in most cases can be expanded to general construction procedures. This report will not deal with engineering errors or interference problems which, of course, we try to avoid as normal practice."[88] This report does not constitute an "inspection" under the terms of the statute. The Court also finds that the later reports do not demonstrate any "inspection" of the East Coker facility.[89]

Because the Court finds the peremptive period contained in La. R.S. 9:2772 is applicable under the facts of this case, the Court finds that Exxon's claim against Foster Wheeler is no longer viable.[90] This result may seem harsh, particularly where as in this case, the parties have conceded for purposes of this motion that the elbow was made of the wrong type of material by Foster Wheeler. However, the Court must in this diversity action apply the laws and jurisprudence of the State of Louisiana. Any change in this law must come from the Louisiana Legislature and not this Court.

Therefore:

IT IS ORDERED that the peremptive period set forth in La. R.S. 9:2722 applies under the facts of this case.[91]

---

86. Exxon Exhibit E–39.

87. Exhibit E–39, p. 1.

88. Exhibit E–39, p. 1.

89. Exxon offers documents ranging from 1963 to 1987 as support for its inspection exception. After a review of the documents, the Court finds that the latest document which arguably suggests any inspection is a July 8, 1966 Foster Wheeler memorandum which discusses a "test run" of the East Coker. Exxon Exhibit E–43. The subsequent documents relate to new construction at the Humble Oil facility. Consequently, at best the ten year peremptive period in 9:2772 commenced after the 1966 activity. Exxon's action was not filed until 1993, nearly thirty years after the 1966 activity.

90. The Court has considered all of the contentions of the parties whether specifically discussed herein or not.

91. Because this issue has been bifurcated from the remaining issues in the case, the Court will favorably consider a request to enter a Rule 54(b) judgment under the Federal Rules of Civil Procedure if requested by a party.